466 F.2d 1013
 WAGNER ELECTRIC CORPORATION, Petitioner,
v.
John VOLPE, Secretary of Transportation and Douglas W.Toms,
Administrator, National Highway Traffic Safety
Administration of the United States
Department of Transportation.
 No. 71-1976.
 United States Court of Appeals,
Third Circuit.
 Argued June 6, 1972.
Decided Aug. 29, 1972.
 
 Howard A. Heffron, Washington, D. C. (Kenneth R.Arnold, Newark, N.J., on the brief), for petitioner.
 Thomas J.Press, Dept. of Justice, Civil Div., Washington, D.C. (L.Patrick Gray, III, Asst. Atty. Gen., Walter H. Fleischer, Atty., Dept. of Justice, Washington, D.C., on the brief), for respondents.
 Before ADAMS, GIBBONS and MAX ROSENN, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 In this proceeding petitioner Wagner Electric Corporation seeks judicial review of an order dated August 28, 1971 of the National Highway Traffic Safety Administration which amended Federal Motor Vehicle Safety Standard No. 108 governing the performance of turn signal and hazard warning flashers. This court has jurisdiction by virtue of Sec. 105(a)(1) of the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. Sec. 1394(a)(1). The amending order was adopted by the Administrator in an informal rulemaking proceeding. The petitioner concedes that informal rulemaking pursuant to Section 4 of the Administrative Procedure Act, 5 U.S.C. Sec. 553, rather than adjudication or formal rulemaking pursuant to Sections 7 and 8 of that Act, 5 U.S.C. Secs. 554, 556, 557, was permissible. See Automotive Parts & Accessories Association v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330 (D.C.Cir. 1968); 49 C.F.R. Sec. 553.15. Petitioner contends, however, (1) that the notice of proposed rulemaking, required by Sec. 4(b) of the Administrative Procedure Act, 5 U.S.C. Sec. 553(b), was materially defective and (2) that the Administrator proceeded on the basis of a fundamental misconception as to the meaning of the National Traffic and Motor Vehicle Safety Act of 1966. 15 U.S.C. Sec. 1381 et seq.
 
 The Agency Record
 
 2
 The Administrator has filed with this court the agency record as required by 15 U.S.C. Sec. 1394(a) and 28 U.S.C. Sec. 2112(b). That record discloses that the initial Safety Standard No. 108, a comprehensive regulation governing lamps, reflective devices and associated equipment, was first published in the Federal Register on February 3, 1967. 32 Fed. Reg. 2408. It incorporated by reference SAE Standard J 590b, Automotive Turn Signal Flashers, and SAE Recommended Practice J 945, Vehicular Hazard Warning Signal Flashers, originally promulgated by the Lighting Committee of the Society of Automotive Engineers (SAE). These two subsections of Standard 108 governed those devices which produce the familiar on-off light cycle providing notice of impending turns or warning of a disabled vehicle. The SAE standards had been promulgated originally for industry use. Their incorporation by reference continued unchanged until the order now under review.[1] The SAE Standards embrace among other matters performance criteria for starting time, voltage drop, flash rate and percent of on-time, and durability. Starting time is the time within which the flasher must begin functioning after a signal is operated. Voltage drop affects the current reaching the lamps and hence the intensity of illumination. Flash rate and percent of on-time affect the eyes' perception of the signal. Durability affects the length of time the flasher is expected to operate without failure.
 
 
 3
 In addition to these performance criteria the SAE Standards include provisions defining procedures for the selection and testing of samples to determine the product's conformance to the criteria. Those procedures require the random selection of twenty sample flashers from a group of fifty flashers representative of those regularly manufactured and marketed. These twenty are tested for conformity to all performance criteria except durability. Seventeen of the twenty must pass. If seventeen of the twenty pass, another random selection of twenty is made from the remaining thirty and these are tested for certain performance requirements and also for durability. Again seventeen of the twenty must pass. If in both groups of tests permissible failure rates are not exceeded the manufacturer's flashers are considered to comply with the performance requirements.
 
 
 4
 In January 1970 a notice of proposed rulemaking was published in the Federal Register, 35 Fed.Reg. 106. This notice provides in part:
 
 
 5
 "The Federal Highway Administrator proposes amending Standard No. 108 to include additional requirements; to amend references to certain SAE Standards updated by the SAE since 1967; and to provide classification of several existing requirements. The proposed amendments are discussed below. . . ."
 
 
 6
 Then follow paragraphs (a) through (y) in which the proposed amendments are discussed. None of these paragraphs refer to any proposed changes in the performance criteria for flashers or in the procedures for testing samples to determine a product's conformance to the criteria. Indeed the January 1970 notice specifically makes reference to SAE Standard J 590(b) and SAE Recommended Practice J 945. 35 Fed.Reg. at 109.
 
 
 7
 On October 31, 1970 the Administrator published in the Federal Register a series of amendments to Standard 108 based upon the January 1970 notice of proposed rulemaking. 35 Fed.Reg. 16840. See 5 U.S.C. Sec. 553(e). Among those amendments is the following:
 
 
 8
 "(n) Combination turn signals and hazard warning signal flashers will meet the requirements applicable to each, when tested in sequence. Manufacturers of turn signals and hazard warning signal flashers have commented that economic factors and the current state of the art in manufacturing lamps preclude a quality level that would totally eliminate occasional random failures. This condition is reflected in the language in Standard No. 108 that lighting equipment 'shall be designed to conform' to the stated requirements. The SAE recognizes the problem by specifying an allowable percentage of failures in SAE Standards J 590b, 'Automotive Turn Signal Flasher,' and J 945 'Vehicular Hazard Warning Signal Flasher.' Such a provision is inappropriate, however, for regulatory purposes. It is doubtful that specific failure allowance in a standard would correspond with the statutory mandate that 'No person shall manufacture for sale . . . any motor vehicle or item of motor vehicle equipment . . . unless it is in conformity with [any applicable] standard.' (15 U.S.C. Sec. 1397(a)(1)). From a practical standpoint, such a provision would tend to make the requirement unenforceable except in extreme cases, since failures within a single lot are statistically inconclusive in determining the extent of failures in overall production. Therefore the sampling provisions of the two SAE Standards, originally incorporated by reference in Standard 108, are expressly omitted from the standard in this issuance. The omission should not cause hardship, since the 'designed to conform' language has been retained." (emphasis supplied, bracketed material in original).
 
 
 9
 The effect of this rulemaking was to retain the SAE performance criteria but to omit the sampling provisions and substitute a requirement of 100 percent compliance. The Administrator's statutory reference, 15 U.S.C. Sec. 1397(a)(1), provides:
 
 
 10
 "(a) No person shall-
 
 
 11
 (1) manufacture for sale . . . any . . . item of motor vehicle equipment manufactured on or after the date any applicable Federal motor vehicle safety standard takes effect under this subchapter unless it is conformity with such standard. . . ."
 
 
 12
 The petitioner objected to the change on the ground that the notice of proposed rulemaking published in January 1970 contained no reference to omitting the sampling procedures of the SAE standards. It requested that the quoted amendment to Standard 108 be withdrawn and a new rulemaking proceeding be commenced on proper notice. In response the Administrator on February 3, 1971 published an order, 36 Fed. Reg. 1896, which in relevant part provided:
 
 
 13
 "Standard 108 was amended without notice to omit sampling provisions in order to bring the standard into conformity with the National Traffic and Motor Vehicle Safety Act of 1966, which requires that all items conform to applicable standards. Therefore the safety standards should not specify sampling provisions or failure rates. It is the manufacturer's responsibility to institute a test program that is sufficient to legally constitute due care, on a continuing basis, to insure that all products manufactured after the effective date of a standard meet the applicable requirements. However, in response to the procedural objection that the change is important enough to merit notice and opportunity to comment, Wagner's petition is granted and paragraphs S 4.4.2 and Tables I and III are being amended to strike the language precluding sampling provisions. At the same time, this agency is publishing today a notice . . . proposing omission of sampling provisions as of January 1, 1972, the date when this omission would otherwise have been effective."
 
 
 14
 The notice, published the same day, 36 Fed.Reg. 1913, states that in response to an objection by an interested manufacturer the amendment which omitted the sampling and permissible failure rates was not included in the notice and that the amendment was withdrawn and a new notice published. The new notice proposes that Standard 108 be amended to incorporate by reference SAE J 590(b) and J 945, "omitting sampling provisions." The new notice makes no reference to any other change; in particular it makes no reference to a change in the performance criteria for flashers. Possibly as an intimation of things to come the notice states:
 
 
 15
 "The agency does not, however, accept the proposition that every change in detail made from a notice of proposed rule making must be resubmitted as a proposal before a final rule may be issued. In this area of complex technical rule making, such a practice would greatly increase the number of notices that would have to be issued, without corresponding public benefit. It does not appear to be mandated by the Administrative Procedure Act's provision (5 U.S.C. Sec. 553) that notices of proposed rule making shall include 'either the terms of [sic] substance of the proposed rule or a description of the subjects and issues involved.' "
 
 
 16
 In response to the new notice the agency received comments from many segments of the industry: automobile manufacturers, original equipment manufacturers, and replacement parts manufacturers. Roughly these comments break down into those few suggesting that elimination of the permissible failure rate testing was feasible if flasher equipment other than the thermal type now in use were adopted, those suggesting that the SAE specification, including the permissible failure rate, was satisfactory, and those approving the deletion of the permissible failure rate but only if the performance criteria were substantially downgraded. Some comments suggest that transistorized flasher units could be substituted for the thermal flashers generally in use, but at an increased cost to the consumer and with a substantial manufacturing start up delay.
 
 
 17
 On April 2, 1971 the petitioner responded to the new notice, pointing out that the SAE specifications had been developed as an integrated whole. It urged that the elimination of the sampling procedures should not be undertaken without a reconsideration of the performance and durability criteria which were fixed with the sampling procedures in mind. It urged that if the agency insisted upon elimination of the sampling procedures it issue a new notice of proposed rulemaking appropriately enlarging the scope of the proceeding so that all relevant matters could be considered, including changes in the performance criteria.
 
 
 18
 The agency did not issue a new notice. It did, however, submit the February 3, 1971 notice to its own Office of Operating Systems. On June 7, 1971 the Director of that Office returned the amendment to the Agency's Acting Chief Counsel without approval, commenting:
 
 
 19
 "Deletion of the sampling and permissible failure rate provisions of SAE Standards J 590b and J 945 without corresponding adjustment in the performance requirements of those standards is not considered to be reasonable and practicable."The "reasonable and practicable" language is from Section 103 of the Act, 15 U.S.C. Sec. 1392, which authorizes the agency to establish safety standards, and which directs:
 
 
 20
 "(f) In prescribing standards under this section, the Secretary shall -
 
 
 21
 ******
 
 
 22
 * * *
 
 
 23
 (3) consider whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed . . ."
 
 
 24
 The Administrator accepted the position of the Office of Operating Systems that eliminating the SAE permissible failure rates while retaining the SAE performance criteria was not reasonable and practicable. Instead, however, of issuing a third notice of proposed rulemaking to enlarge the scope of the proceeding, the administrator on August 28, 1971 published a new standard which not only eliminated the SAE permissible failure rate but which also substantially downgraded the performance criteria. 36 Fed.Reg. 17343. A comparison of the old and new performance criteria follows:
 
 
 25
 Requirement SAE Standards August 28, 1971 Order
Starting Time Turn Signal 1-1.25 seconds 2 seconds
 Flasher
Hazard Warning Flasher 1.5 seconds 3 seconds
Voltage Drop Turn Signal .40-.45 volts .8 volts
 Flasher
Hazard Warning Flasher .45 volts .8 volts
Flash Rate & % on Time Turn
 Signal
Flasher 60-120 flash rate 40-140 flash rate
 30-75% on time 25-80% on time
Hazard Warning
Flasher 60-120 flash rate 40-140 flash rate
 30-75% on time 25-80% on time
Durability Turn Signal
Flasher Total time 200 hours 25 hours continuous
 cycled operation
 15 seconds on 15 seconds
 off
Hazard Warning
Flasher 36 hours continuous 12 hours continuous
 operation operation
 
 
 26
 This August 28, 1971 order is the subject of the petition for review.
 
 Adequacy of the Notice
 
 27
 The Administrator contends that the notice of its intention to amend Standard 108 by the elimination of permissible failure rates was sufficient to give interested parties an opportunity to comment on the entire subject matter of the standard. Pointing to cases such as California Citizens Brand Association v. United States, 375 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967) the Administrator urges that there was adequate compliance with 5 U.S.C. Sec. 553(b) because the notice provides a description of the subjects and issues involved. It buttresses this argument by pointing in the record to the responses to the notice from flasher manufacturers and automobile manufacturers which did in some instances discuss the desirability of downgrading performance criteria if permissible failure rates were eliminated.
 
 
 28
 We cannot accept the Administrator's position. Indeed that position is inconsistent with the agency's earlier concession that the first notice was inadequate. The fact that some knowledgeable manufacturers appreciated the intimate relationship between the permissible failure rate provisions and the performance criteria, and so responded, is not relevant. Others possibly not so knowledgeable also were interested persons within the meaning of 5 U.S.C. Sec. 553.
 
 
 29
 For example, in each of the fifty states there is a state agency concerned with automotive safety. Regulation by these agencies antedated the passage of the National Traffic and Motor Vehicle Safety Act of 1966. The interrelationship between state and federal regulation presents complex problems of federal preemption. See 15 U.S.C. Sec. 1392(d). Compare Chrysler Corporation v. Rhodes, 416 F.2d 319 (1st Cir. 1969) with Chrysler Corporation v. Tofany, 419 F.2d 499 (2d Cir. 1969). The state motor vehicle safety agencies may well have been uninformed of the manufacturing difficulties which made it not "reasonable and practicable" to maintain the performance criteria without a failure rate provision. They were not informed by either of the published notices of proposed rulemaking that the federal agency proposed to downgrade the flasher performance criteria. Yet these state agencies were vitally affected, since the Act provides:
 
 
 30
 "Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard." 15 U.S.C. Sec. 1392(d).
 
 
 31
 These state agencies had no notice of the subjects (performance characteristics of flashers) and issues (downgrading standards versus permissible failure rates) involved in the proposed rulemaking.
 
 
 32
 Moreover the durability criteria, which affect both original equipment and replacement equipment, may be of considerable interest to consumer advocates. Such groups received no notice that the agency proposed to make a trade off by downgrading required durability in order to eliminate a relatively insignificant permissible failure rate. The Administrator concedes that even the elimination of the test for compliance with a permissible failure rate will not result in eliminating occasional random failures inherent in any mass production process because of variations in materials, machines and labor force. The record does not contain the views of consumer groups as to the substitution of a lower durability standard in place of an acceptable quality level at a higher durability standard. The absence of comment from such groups may well be because the notice of proposed rulemaking never advised of this subject or issue. Thus we conclude that there was no adequate notice of proposed rulemaking.
 
 
 33
 The Administrator has urged that if we conclude the notice was defective we should disregard the defect because the agency published the August 28, 1971 order, 32 Fed.Reg. 17343, and thereby gave interested persons notice of an opportunity to petition for its amendment or repeal. See 5 U.S.C. Sec. 553(e). The short answer to this contention is that Section 4(b) of the Administrative Procedure Act requires notice before rulemaking, not after. The right of interested persons to petition for the issuance, amendment or repeal of a rule, granted in Section 4(e) of that Act, is neither a substitute for nor an alternative to compliance with the mandatory notice requirements of Section 4(b).
 
 Meaning of the Statute
 
 34
 The petitioner contends that the basis of the Administrator's decision is that there is no authority under the National Traffic and Motor Vehicle Safety Act of 1966 for a standard embracing an acceptable quality level (permissible failure rate). This, he urges, is a fundamental misconstruction of the statute. Thus even if we had found the notice to be adequate, and even if we had found the elimination of the permissible failure rate provision to be a matter within the Administrator's sound discretion, petitioner urges, we would nevertheless be required to remand. Securities & Exchange Commission v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943).
 
 
 35
 The administrative record in several places refers to the agency's reliance on 15 U.S.C. Sec. 1937(a)(1), which prohibits the manufacture for sale of any motor vehicle or item of motor vehicle equipment unless it is in conformity with an applicable standard. That section, however, is a part of the enforcement provisions of the Act. It does not define the extent of the administration powers in establishing those standards with which manufacturers by virtue of 15 U.S.C. Sec. 1397(a)(1) must comply. Although the matter is not free from doubt, it would seem that under the broad language of 15 U.S.C. Sec. 1392(f)[2] the Administrator would be free in some cases to strike a balance between higher performance criteria and acceptable quality levels.
 
 
 36
 We do not decide that issue of statutory interpretation now. The notice of proposed rulemaking which antedated the adoption of the challenged order set forth the agency's position that permissible failure rates were contrary to both the letter and the interest of the law. By the time the challenged order was published the agency's position may have changed somewhat. The published order sets forth that the sampling provisions are considered by the agency, both as a policy matter and as a legal matter, to be inappropriate. At this juncture we cannot tell if, leaving aside 15 U.S.C. Sec. 1397(a)(1), the Administrator would still have considered the sampling provisions inappropriate under 15 U.S.C. Sec. 1392(f) as a matter of policy.
 
 
 37
 Our holding, then, is limited to setting aside the order of August 28, 1971 because it was adopted without observance of the notice procedure required by law, 5 U.S.C. Sec. 706(2)(D), and to remanding the matter to the National Highway Traffic Safety Administration for a new rulemaking proceeding on adequate notice. In that new proceeding we urge that the Administrator make clear, if it adopts a standard which eliminates sampling provisions, whether it does so because that action is compelled by the Act, or as an informed policy judgment pursuant to 15 U.S.C. Sec. 1392. See Automotive Parts & Accessories Assn. v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330, 338(1968).
 
 
 38
 The petition to set aside the August 28, 1971 order will be granted, and the matter remanded to the National Highway Traffic Safety Administration for new rulemaking proceedings consistent with this opinion.
 
 
 
 [1]
 Originally Standards 108 and 112 covered the same lighting standards for different types of vehicles, but in December, 1967 Standard 112 was incorporated into Standard 108. 32 Fed.Reg. 18033. The 1967 action made no change in the standards for flashers
 
 
 [2]
 FACTORS TO BE CONSIDERED IN PRESCRIBING STANDARDS
 (f) In prescribing standards under this section, the Secretary shall-
 (1) consider relevant available motor vehicle safety data, including the results of research, development, testing and evaluation activities conducted pursuant to this chapter;
 (2) consult with the Vehicle Equipment Safety Commission, and such other State or interstate agencies (including legislative committees) as he deems appropriate;
 (3) consider whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed; and
 (4) consider the extent to which such standards will contribute to carrying out the purposes of this chapter.