The CITY OF NEW YORK et al.,
Plaintiffs,

v.

Henry L. DIAMOND, Individually and in his official capacity as Commissioner of the New York State Department of Environmental Conservation, et al., Defendants.

No. 73 Civ. 5293.

United States District Court,
S. D. New York.

July 24, 1974.

As Amended July 31, 1974.

Adrian P. Burke, Corp. Counsel, New York City, for plaintiffs; Beverly Gross, Asst. Corp. Counsel, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., New York City, for State defendants; Lloyd Milliken, Asst. Atty. Gen., of counsel.

Paul J. Curran, U. S. Atty., New York City, for Federal defendants; Steven J. Glassman, Asst. U. S. Atty., of counsel.

## OPINION

LASKER, District Judge.

This case raises a question of major import to members of minority groups interested in finding employment in the construction industry in New York City. In its simplest terms, the issue is what affirmative efforts to employ minority workers the City can require of construction contractors engaged on City projects funded by the City, state and federal governments. The factual context in which the question arises involves the City's application for federal and state grants for the construction of two sewage treatment plants at Red Hook, Brooklyn, and Oakwood Beach, Staten Island.

The City has applied to the United States Environmental Protection Agency ("U.S.E.P.A.") for federal funding for the construction of sewage treatment fa-

cilities at Red Hook and Oakwood Beach. These projects are necessary to comply with the standards for effluent wastes contained in the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. Subchapter II of the Act authorizes the assumption by the federal government of seventy-five percent of construction costs of approved water pollution control facilities. 33 U.S.C. § 1281 et seq. However, the U.S.E.P.A. may not approve a grant for a project unless it has been certified as entitled to priority over other state projects by the appropriate state agency, in this case the New York State Department of Environmental Conservation ("State Department of Environmental Conservation"). § 204(a)(3), 33 U.S.C. § 1284(a)(3). Certification has been granted for Red Hook and Oakwood Beach. In March, 1973, the City and the U.S.E.P.A. executed agreements for the funding of the initial phases of the construction of these projects. Contracts for the latter have already been put out for bidding; contracts for the former are ready to be put out.

Under the regulations of the U.S.E.P.A., an applicant for federal funds must state that it is in compliance with federal Executive Order No. 11246, which requires it to include in its contracts a provision that the contractor will not discriminate against any employee or applicant for employment on the basis of race, color, religion, sex or national origin and will take affirmative action to ensure the existence of nondiscriminatory hiring and employment practices. Executive Order No. 11246, § 202(1).

Until January, 1973, the affirmative action plan required by the City of its contractors was the "New York Plan," a federally approved agreement entered into in December, 1970, by New York City, New York State and the New York Building and Construction Industry Board of Urban Affairs Fund ("Board of Urban Affairs"), an industry group representing construction contractors and building trades unions. The City withdrew from the New York Plan in January, 1973, and the following July promulgated its own plan, which has come to be known as the "Mayor's Plan." This plan, which the City seeks to impose on contractors employed on its projects, makes minority hiring demands of contractors which exceed those found in the New York Plan.

The City submitted its new plan to the State Department of Environmental Conservation as an amendment to its plans and specifications for the Red Hook project, for approval and transmission to the U.S.E.P.A. Both the State Department of Environmental Conservation and the U.S.E.P.A. notified the City that its new plan was not acceptable, and that the specifications for Red Hook and any other project containing the Mayor's Plan would not be approved. Both agencies indicated that approval was withheld because in their view, the City could not incorporate in its federally and state funded contracts requirements which exceeded the demands of the federally approved New York Plan. The source of this position is a memorandum issued on July 19, 1973, by the United States Secretary of Labor, Peter J. Brennan, which prohibits local governments from imposing any equal employment opportunity requirements which have not been approved by the United States Department of Labor on federally funded construction projects. The policy laid down by the Brennan Memorandum was subsequently adopted by the New York State Department of Labor ("State Department of Labor"), by letter dated June 29, 1973.

Shortly thereafter, the City of New York and various City officials (collectively "the City") filed suit seeking declaratory and injunctive relief against federal and state disapproval of City applications for federal assistance solely because its affirmative action program includes the Mayor's Plan.[1] Defendants

---

1. A related case (Percy v. Brennan, 73 Civ. 4279 (S.D.N.Y.)) has also been filed on behalf of Albert Percy and two other minority persons seeking employment in the New

are the state Commissioners of Environmental Conservation and Labor, the Administrator of the U.S.E.P.A. and the Administration of its New York City Regional Office and the United States Secretary of Labor.

All the defendants move to dismiss. In the alternative, the federal defendants seek a stay of this proceeding and the state defendants move for summary judgment. The City originally sought a preliminary injunction, but it has been agreed between the parties and the court that their motion may be treated as one for summary judgment.

## I.

Executive Order No. 11246 is the source of the equal employment obligations of federal and federally-assisted contractors. Part I of the order requires that federally-funded contracts include the provision that:

> "The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection

for training, including apprenticeship." *Id.* at § 202.

Furthermore, the contractor must undertake to "comply with all provisions of Executive Order No. 11246 . . . and of the rules, regulations, and relevant orders of the Secretary of Labor." *Id.*

The Secretary of Labor is charged with the responsibility for administering the compliance provisions of the order, contained in Parts II and III. *Id.* at § 201. The Director of the Office of Federal Contract Compliance is authorized to implement the equal employment policies of the Secretary of Labor. Order No. 15–68 of the Secretary of Labor, 33 Fed.Reg. 2600 (Sept. 4, 1968). The two methods by which compliance with the order has been obtained entail use of either an "imposed plan" or a "hometown plan". An "imposed plan," as the name indicates, is a plan which is imposed by the Secretary of Labor, establishing yearly minority employment goals on a trade-by-trade basis, with increasing participation each year. The "hometown plan" approach involves local contractors and contractors associations, building trades unions and minority organizations in the formulation of a plan for voluntary compliance with the order. Under a hometown plan, minority participation obligations fall on the trade as a whole rather than on any individual contractor, and can be satisfied by minority employment on any work performed by the trade, whether federally-funded or private. A hometown plan must be sub-

York City construction industry and of two organizations seeking to represent such persons requesting an injunction ordering the relevant federal and state agencies and officials to abandon the New York Plan, to withdraw the Brennan Memorandum and the letter of the State Department of Labor and to promulgate equal employment opportunity requirements for public construction adequate under the United States Constitution, 42 U.S.C. § 1981 and Executive Order No. 11246. They also seek appropriate declaratory relief. Plaintiffs in that case move for 1) a preliminary injunction; 2) partial summary judgment; 3) a class action determina-

tion and 4) consolidation of their case with the City cases. The two cases raise many of the same issues and have until this time been treated by the parties and the court as if they had already been consolidated. Indeed, the excellent briefs of the *Percy* plaintiffs' able counsel have been of great assistance in deciding the instant motions. However, because certain complexities are present in the *Percy* case which are not present in the City case, we have decided in the interest of speed to treat the *Percy* motions in a separate opinion to be filed hereafter. Accordingly, this opinion will deal only with the motions filed in the City case.

mitted to the Office of Federal Contract Compliance for approval and, if approved, is incorporated by reference in Part I of the Federal Bid Conditions. For trades which decline to participate in a hometown plan, mandatory affirmative action requirements are set forth in Part II of the Federal Bid Conditions. Responsibility for compliance with these requirements is imposed directly on the individual contractor, as to his work force, rather than on the non-participating trade as a whole.

The federally-approved hometown plan in New York State is the New York Plan referred to earlier. It was submitted to the federal government for approval in 1970 by the Board of Urban Affairs, mentioned above, which is a creation of the Building & Construction Trades Council, representing labor organizations, and two contractor associations, the Building Trades Employers Association and the General Contractors Association. The U.S. Department of Labor declined to approve it in April of that year. Following negotiations between the Board of Urban Affairs and the City and State of New York an agreement was signed adopting the New York Plan, which is substantially identical to the Board's original plan. Approval was implemented by executive orders of the Mayor (Executive Order No. 31) and the Governor (Executive Order No. 43) in January, 1971. The following August the Office of Federal Contract Compliance announced its approval of the New York Plan. Following a number of extensions, approval of the Plan is scheduled to expire on August 1, 1974.

The New York Plan (Complaint, Exhibit E) originally provided for on-the-

job training for a maximum of 800 minority workers (*id.*, Art. IV, § 2), with goals established on a craft-by-craft basis, with qualified graduates of the program to be recommended to the appropriate union "for consideration for membership" (*id.*, Art. II, § 2). The Plan was to be funded by the State and the City "on a 50–50 basis, less any Federal funds that may be obtained." *Id.*, Art. IX.

The Plan expired on July 1, 1972, but was extended by informal agreements into 1973. In spring of 1973, New York State and the Board of Urban Affairs approved a formal extension of the Plan, which was approved as a hometown plan by the U.S. Department of Labor in April, 1973. The extended Plan differed from the original Plan in that it provided for the training of 1,000 rather than 800 minority workers and that New York City was no longer a participant, since it had withdrawn from the Plan in January, 1973. In place of the Plan, the City promulgated rules and regulations to take effect on July 20, 1973. These rules and regulations, together with the Mayor's Executive Order No. 20 of July 15, 1970,[2] constitute the Mayor's Plan. The Mayor's Plan imposes an obligation on public contractors, individually rather than by trade, to make a good faith effort to employ one minority trainee per four journeymen.

On July 19, 1973, the U.S. Secretary of Labor issued the memorandum referred to earlier stating that "administering agencies are directed to inform their grantees that where there is a viable and effective hometown or imposed construction industry plan in operation in a geographical area, additional and/or

---

2. Executive Order No. 20 was promulgated on July 15, 1970 (New York City Record, July 20, 1970), pursuant to Executive Order No. 71 of April 2, 1968 (New York City Record, April 15, 1968). Executive Order No. 31, dated January 18, 1971 (New York City Record, January 27, 1971), abrogated the effectiveness of Executive Order No. 20 by making New York City a participant in the New York Plan and by providing that participation in the Plan should be considered "as affirmative action and evidence of compliance with Executive Order No. 71" (*Id.* at § 4). However, by Executive Order No. 74 of January 23, 1973 (New York City Record, February 8, 1973), New York City withdrew from the New York Plan and reactivated Executive Order No. 20.

supplementary State or local EEO requirements may not be applied to Federally-assisted construction projects." Complaint, Exhibit P.

After the Red Hook project was certified by the State of New York to the U.S.E.P.A. as a priority project for federal grant assistance, the agency approved its first phase, subject to a review of the City's plans and specifications in connection with it. The City submitted its plans and specifications, including the New York Plan, to the State Department of Environmental Conservation in June, 1973, and they were forwarded to the federal agency. After promulgation of the Mayor's Plan in July, the City submitted addenda to the Red Hook contract documents containing the new plan to the state agency for transmission to the U.S.E.P.A. However, the former declined to forward the amendments and notified the federal agency that it was retracting its acceptance of the Red Hook contract specifications until the conflict between the Mayor's Plan and the New York Plan could be resolved by the State Department of Labor. Complaint, Exhibit G(b). Subsequently, the State Department of Labor informed the State Department of Environmental Conservation that the Mayor's Plan was unacceptable because it was not in accord with the New York Plan. Complaint, Exhibit G(c). The State Commissioner of Environmental Conservation, Henry L. Diamond, transmitted the State Department of Labor's communication to the Commissioner of the New York City Environmental Protection Administration, Martin Lang, together with a letter, stating:

"In consideration of the above, it is advised that all proposed addenda outlining the 'New York City Mayor's Plan' should be deleted from the Red Hook contract documents to make them acceptable to both the State and Federal Governments. This should be done so as not to jeopardize the grants already committed and the fu-

ture grants that your agency is presently requesting." Complaint, Exhibit H.

The City then contacted the U.S.E.P.A. directly, requesting it to instruct the State Department of Environmental Conservation that its determination that the Mayor's Plan was unacceptable was not a proper basis for withholding approval of the City's grant application, both because a state's role under the Water Pollution Control Act is limited to certifying a grant's priority nature and because inclusion of the affirmative action requirements of the Mayor's Plan is not a proper ground for disqualifying the City's grant application. Complaint, Exhibit I. The U.S.E.P.A. replied by letter, dated November 13, 1973, that it was unable to comply with the City's request. The letter stated:

"The conditions upon which the grant was made require compliance with equal opportunity requirements in advertising for construction contracts. Such requirements have been interpreted by the U.S. Department of Labor to the effect that where there is a viable and effective hometown plan or imposed construction industry plan in operation in a geographical area, additional and/or supplementary State or local EEO requirements may not be applied to Federally assisted construction projects.

"To the extent that the contract specifications applicable to the Red Hook Project are not in conformity with the Labor Department's interpretation, that is, that they incorporate additional New York City requirements, the specifications and any resultant contract would not be approvable by EPA, and the construction contract costs under the EPA grant would not be considered as eligible costs under the EPA grant. In addition, a failure to comply with the EEO requirements of the grant agreement may serve as a basis for the withholding of grant funds or termi-

nation of the grant in accordance with applicable grant regulations." Complaint, Exhibit J.

Having been instructed by the State Department of Environmental Conservation and the U.S.E.P.A. that, because of its inclusion of the Mayor's Plan, the Red Hook contract would not be approved for federal funding by either agency, the City filed the instant suit, which, as we have indicated, seeks injunctive and declaratory relief permitting the implementation of the Mayor's Plan on Red Hook and other federally-funded construction projects.

On January 16, 1974, the U.S. Secretary of Labor, the Assistant Secretary of Labor for Employment Standards and the Director of the Office of Federal Contract Compliance issued a regulation, 39 Fed.Reg. 2365, which was published in the Federal Register on January 21, 1974, to be effective on the date of publishing. It constitutes an amendment to 41 CFR § 60–1.4 and, according to its preamble, is intended:

> "to clarify the extent to which the U. S. Department of Labor will deem State and local government equal employment opportunity requirements applicable to federally assisted construction contracts subject to the equal employment requirements of Executive Order 11246, as amended, and its implementing rules, regulations, and orders, including Federal equal employment opportunity bid documents incorporating the requirements of voluntary or imposed construction industry plans established pursuant to the Executive Order." 39 Fed.Reg. 2365. (January 21, 1974).

The regulation requires any state or local government which intends to impose affirmative action requirements on contractors working on federally assisted construction projects to submit the requirements to the Director of the Office of Federal Contract Compliance for approval. The Director must render a decision within 60 days of submission. His decision is appealable by the state or local government and any person or group affected by it, including, for example, construction contractors, labor organizations and minority community groups, to the Assistant Secretary of Labor for Employment Standards. The appeal process must be completed within 101 days of the publication of the Director's decision. The regulation provides further:

> "Such State or local government requirements will be deemed applicable to federally assisted construction contracts unless the Director, or in the case of an appeal of the Director's determination, the Assistant Secretary for Employment Standards, determines that such requirements are inconsistent with the Order or incompatible with the effective implementation of the federal minority hiring and/or training plan (either voluntary or imposed) in the area. The State or local government affirmative action hiring and/or training requirements shall not be included in federally assisted construction contracts until the Director, or, in the case of an appeal, the Assistant Secretary, has had an opportunity to make a determination in accordance with this paragraph." 41 CFR § 60–1.4(b)(2), 39 Fed.Reg. 2365 (January 21, 1974).

Although it challenged both the new regulation's validity and its applicability to the Red Hook project, whose plans and specifications had been rejected prior to its adoption, the City submitted the Mayor's Plan to the Department of Labor for a determination pursuant to the regulation. The period for determination was extended by the City from June 3 to June 24, 1974. The Director did not make a determination by that date and no determination is anticipated. Instead, the Department of Labor takes the position that its failure to act within the time frame established by the regulation constitutes approval by default, permitting the City to implement the Mayor's Plan with respect to Red Hook and any other federally-funded project.

## II.

The federal defendants originally moved for dismissal, or in the alternative for a stay, on the ground that the City had not exhausted the remedies created by the new regulation. Subsequently, the City submitted its requirements to the Director of the Office of Federal Contract Compliance for approval, pursuant to the regulation, and they became effective by the Director's failure to act within the prescribed period. Accordingly, the City has exhausted its remedies and the federal defendants' motion is denied as moot.

The federal defendants, however, now take the position that the entire case ought to be dismissed as moot. Their reasoning is that, since the City's requirements have become effective by the nonaction of the Office of Federal Contract Compliance and the Red Hook grant funds will be released in the near future, the City has achieved its objective in suing. Their stance is untenable for several reasons.

First, the regulation, as noted above, provides for an appeal by any interested party to the Assistant Secretary for Employment Standards, and an appeal has, in fact, been filed by the Board of Urban Affairs. Pursuant to the regulation, the Assistant Secretary has 80 days from the end of the appeal period, which runs 21 days from publication of the Director's determination in the Federal Register. No publication has yet occurred, and when publication takes place the Secretary has another 101 days within which to act. Accordingly, the ultimate determination by the Department of Labor of the validity under the regulation of the Mayor's Plan is still in doubt.

The federal defendants argue that the appeal period does not affect the question of mootness, because the City's requirements became effective immediately upon the expiration of the time within which the Director was to act. This argument, however, is unpersuasive, because the failure of the Director to act on the City's submission does not give the City the full relief it seeks. The City is requesting injunctive and declaratory relief which will permit the unfettered implementation of its affirmative action program. Even adopting the federal defendants' approach to the new regulation, the City's ability to implement its requirements is impaired inasmuch as any change which the City might desire to make in the Mayor's Plan would require a resubmission to the Office of Federal Contract Compliance, at which point, never having affirmatively determined that the Mayor's Plan is valid, the Office could reject the Plan. This point merely illustrates that the City's case, which challenges the validity of the new regulation, is not mooted out by any actions taken under it. *See* Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); Torres v. New York State Department of Labor, 318 F.Supp. 1313 (S.D.N.Y.1970). As the Supreme Court stated in United States v. W. T. Grant Co.:

"[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.*, does not make the case moot." 345 U.S. 629, 632, 73 S. Ct. 894, 897, 97 L.Ed. 1303 (1953).

The reason given in the *Grant* case for the inapplicability of the mootness doctrine to cases such as this is particularly appropriate in light of the circumstances described above:

"The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion." *Id.* (footnote omitted).

Accordingly, the federal defendants' motion to dismiss the case as moot is denied.

## III.

We turn to the state defendants' motion for summary judgment dismissing

the complaint. They argue that, since the regulations of the U.S.E.P.A. provide that contracts funded pursuant to its provisions must conform to state law, to decide whether the City complaint states a cause of action against them it is necessary to make determinations of state law which, they claim, ought properly be made in the first instance by the state courts. Accordingly, they urge us to abstain from deciding the case. Alternatively, if we reach the merits of their state law claims, they argue that we must find the Mayor's Plan invalid, because the state has preempted the field of equal employment regulation.

Initially, it is essential to understand the parameters of the conflict between the City and the State which we are asked to resolve. The City suit presents only the question whether Red Hook and other City projects containing the Mayor's Plan in their specifications are eligible for *federal* funding. The question of eligibility for state funding is not raised by the complaint, and, accordingly, is not presented for decision here. Whatever we decide here has no bearing on the State's ability to attach any conditions it deems appropriate to grants from the State to the City for Red Hook or any other project.

The City complaint alleges that "[s]tate review of grant applications is limited to water pollution considerations alone" (Complaint, Par. 38) and, therefore, the state defendants "acted in excess of the authority granted them by the Act in determining that plaintiffs' plans and specifications did not comply with federal requirements under Executive Order 11246 because of the inclusion therein of the Mayor's Plan, and defendant Diamond acted in excess of his authority in retracting approval of those plans and specifications on that basis" (*id.*, Par. 39). The state defendants, on the other hand, argue that, because the applicable regulations require that federally funded contracts comply with state law, they did not exceed their authority in refusing to transmit the amendment to the Red Hook plans and specifications containing the Mayor's Plan to the federal government or in retracting their approval of the plans and specifications, because of their inclusion of the Mayor's Plan.

The question presented, whether under the applicable U.S.E.P.A. regulations the state defendants were obliged to transmit the City's grant application to the federal agency, is uniquely federal and the state defendants' preemption argument has no applicability to it.

It is true, as the state defendants contend, that the regulations include, among the conditions to the grant of federal funds, that the funded project's construction must comply with state law. Specifically, 40 CFR § 35.840 provides:

"In addition to the EPA general grant conditions . . ., each wastewater treatment works construction grant shall be subject to the following conditions:

\* \* \* \* \* \*

(e) The construction of the project, including the letting of contracts in connection therewith, shall conform to the applicable requirements of State, territorial, and local laws and ordinances . . . ."

And 40 CFR § 35.935 states:

"In addition to the EPA general Grant Conditions . . ., each grant for treatment works involving building and erection . . . shall be subject to the following conditions:

\* \* \* \* \* \*

The construction of the project, including the letting of contracts in connection therewith, shall conform to the applicable requirements of State, territorial, and local laws and ordinances to the extent that such requirements do not conflict with Federal laws and this Subchapter." (§ 35.935–4).

The state defendants maintain that they have the power, based on these provisions, to refuse to submit to the federal government any grant which in their opinion does not conform with the State's equal employment laws. The

Governor's Executive Order adopting the New York Plan made it the law of the State. Accordingly, the state defendants argue, the City's grant applications must contain the New York Plan *qua* state law and not only because it is the federally approved hometown plan. Furthermore, they contend that they cannot contain the Mayor's Plan in addition to the New York Plan, because the two plans are inconsistent and the former is, therefore, preempted under state law.

■■ The difficulty with the state defendants' position is that, even assuming the correctness of their conclusion that the Mayor's Plan is invalid under state law, nothing in the regulations supports their position that they have the power to refuse to transmit to the federal government applications which they find to be inconsistent with state law, giving them a veto power over the ability of the federal government to contract with a municipality. To the contrary, the regulations allot a very limited role to the transmitting state agency, reserving to the Regional Administrator of the *federal* agency the power to determine whether the grant application conforms with the conditions imposed by the federal government on grants of its money.

The regulations, 40 CFR § 35.920–2, provide:

"An application must be submitted to the State agency for each proposed project. The State agency will submit to the Regional Administrator those applications for construction grants which are complete and which relate to projects which have received priority certification in accordance with § 35.915."

The only prerequisites which the federal regulations impose as a condition to the State agency's required transmission of an application to the Regional Administrator are that the application be complete and that a project shall have received state priority certification. No discretion is furnished the state agency other than to ascertain the fulfillment of those conditions; having done so, "[t]he State agency *will* submit [the application] to the Regional Administrator." *Id.* (emphasis added).

On the other hand, the regulations provide the Regional Administrator with extensive review power over grants submitted to him. As to equal employment requirements, 40 CFR § 35.925 states:

"Before approving a grant for any project for any treatment works, the Regional Administrator shall determine:

\*    \*    \*    \*    \*    \*

That the applicant has complied with the applicable requirements of title VI of the Civil Rights Act of 1964." (*Id.* at § 35.925–9.)

Furthermore, the regulations require the applicant to include in its grant application a "[s]tatement regarding compliance with title VI of the Civil Rights Act of 1964" (40 CFR § 35.920–3(b)(12)) and a "[s]tatement regarding compliance with other applicable Federal statutory and regulatory requirements" (*id.* at (b)(11)).

Thus, the regulations provide that, aside from the limited role accorded the state agency of ensuring the completeness of the grant application and the funded project's priority status, the conformance of the grant application to the governing regulations is to be worked out between the grantor (the federal government through the Regional Administrator) and the grantee (the City). This allotment of rules accords with common sense by placing control over the contractual relationship in the hands of the entity whose money is being dispensed.

■ We assumed, *arguendo*, at the beginning of this discussion, that the state defendants were correct as to the premise which underlies their position, namely, that the Mayor's Plan violates state law. In fact, and this is an additional ground for denying the motion to dismiss, there appears to be no basis for this assumption. As discussed in Part

IV, *infra,* the Mayor's Plan and the New York Plan are not inconsistent. Accordingly, the former is invalid only if the state defendants are correct that the City is precluded from imposing the Mayor's Plan because the State has preempted the field. However, where there is no actual conflict with state law, the City has the power to impose its requirements on contractors working on its own projects as an incident to its contracting powers. *Compare* McMillen v. Browne, 14 N.Y.2d 326, 251 N.Y.S.2d 641, 200 N.E.2d 546 (1964) *with* Wholesale Laundry Board of Trade, Inc. v. City of New York, 12 N.Y.2d 998, 239 N.Y.S.2d 128, 189 N.E.2d 623 (1963), aff'g 17 A.D.2d 327, 234 N.Y.S.2d 862 (1st Dept. 1962).

Accordingly, the state defendants' motion for summary judgment dismissing the complaint is denied.

## IV.

We turn to the merits. The City moves for summary judgment granting final injunctive and declaratory relief 1) requiring the state defendants to reinstate their acceptance of the Red Hook plans and specifications; 2) restraining them from removing the Red Hook and Oakwood Beach projects from the priority list certified to the U.S.E.P.A. or altering their status on the list; 3) restraining the state and federal defendants from reallocating the federal funds presently allocated to those projects to other projects; and 4) enjoining the federal defendants from requiring that the New York Plan be deemed the only acceptable form of compliance with Executive Order No. 11246 and from withholding grant funds from the City for the Red Hook and Oakwood Beach projects solely because of their inclusion of the Mayor's Plan. The City contends that it is entitled to summary judgment against the federal defendants, because it has met all the prerequisites for approval of its application for federal grant funds and their refusal to accord such approval has no basis in law.

Underlying the motion is the City's challenge to the two obstacles standing in the way of approval, the Brennan Memorandum and the new regulation. The City attacks the validity of the former as an unauthorized and improper attempt to preempt local regulations which do not conflict with federal law. It claims that the new regulation is also an unlawful attempt to preempt local regulatory power and is invalid for the further reason that it was improperly promulgated in contravention of the Administrative Procedure Act.

The City seeks summary judgment also against the state defendants on the ground that they have no authority under the Federal Water Pollution Control Act and the applicable U.S.E.P.A. regulations to determine whether an affirmative action program complies with Executive Order No. 11246, and cannot withhold approval of a grant application on that basis.

## A.

We treat first the question of the new regulation's validity. That regulation was published on January 21, 1974, to take effect on the date of publication; that is, the thirty day notice of proposed rule making required by the Administrative Procedure Act, 5 U.S.C. § 553, was not given.

█ The Administrative Procedure Act provides that "[g]eneral notice of proposed rule making shall be published in the Federal Register. . . ." (5 U.S.C. § 553(b)) and that "[t]he required publication . . . of a substantive rule shall be made not less than 30 days before its effective date. . . ." (*id.,* § 553(d)). The purpose of these requirements is two-fold:

"Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated."

Texaco, Inc. v. Federal Power Commission, 412 F.2d 740, 744 (3d Cir. 1969).

A plethora of cases hold that an administrative rule which is not promulgated in accordance with these procedures is void. *See, e. g.,* N. L. R. B. v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (plurality opinion); Wagner Electric Corp. v. Volpe, 466 F.2d 1013 (3d Cir. 1972); Texaco, Inc. v. Federal Power Commission, 412 F.2d 740 (3d Cir. 1969); Hotch v. United States, 212 F.2d 280, 14 Alaska 594 (9th Cir. 1954); Kelly v. United States Department of the Interior, 339 F.Supp. 1095 (E.D.Cal.1972); Pharmaceutical Manufacturers Association v. Finch, 307 F.Supp. 858 (D.Del.1970); National Motor Freight Traffic Association, Inc. v. United States, 268 F.Supp. 90 (D.D.C. 1967) (three judge court), aff'd per curiam, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968); Seaboard World Airlines, Inc. v. Gronouski, 230 F.Supp. 44 (D.D.C.1964). As one of the earliest cases to consider the subject stated:

"The Acts [the Administrative Procedure Act and the Federal Register Act] set up the procedure which must be followed in order for agency rulings to be given the force of law. Unless the prescribed procedures are complied with, the agency (or administrative) rule has not been legally issued, and consequently it is ineffective." *Hotch, supra,* 212 F.2d at 283.

As a result, the new regulation is invalid, unless, as the federal defendants claim, it falls within one of the exceptions enumerated in § 553.

Section 553(d)(3) provides for publication of the proposed rule thirty days before its effective date, except "as . . . provided by the agency for good cause found and published with the rule." Section 553(b) requires the agency to publish in the Federal Register "[g]eneral notice of proposed rule making," except:

"(B) When the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."

The new regulation invokes the "good cause" exception by stating in its preamble:

"We find that notice of proposed rule making and delay in the effective date would be contrary to the public interest and accordingly such notice and delay are not required under 5 U. S.C. 553(b) and (d). Because certain governmental entities have expressed significant interest in appending their own affirmative action hiring and/or training requirements to federally assisted construction already subject to OFC-approved construction industry minority hiring and/or training plans established pursuant to Executive Order 11246, as amended, notice of proposed rule making and delay in effective date would be contrary to the public interest. These amendments are intended to clarify the Department of Labor's policy on State and local government affirmative action hiring and/or training requirements and to further equal employment opportunity objectives. Therefore these amendments shall be effective on January 21, 1974." 39 Fed.Reg. 2365 (January 21, 1974).

As the court stated in *Kelly, supra:*
"An agency availing itself of the 'good cause' exception must first determine that compliance with the 30-day requirement is either impracticable, unnecessary, or contrary to the public interest, and it then must preface the new regulations with a 'finding and a brief statement of the reasons therefor.' 5 U.S.C. § 553(b)(B)." 339 F.Supp. at 1101.

*Kelly* invalidated the regulations in question, because, although the agency made and published within the rule "an implicit 'finding'" that delay would be prejudicial to the persons affected, it

gave "no supporting 'reasons'" for this determination. *Id.*

The regulation in question here suffers from the same defect. The sole "reason" proferred why compliance with the thirty day notice is "contrary to the public interest" (5 U.S.C. § 553(b)(B)) is that "certain governmental entities have expressed significant interest in appending their own affirmative action hiring and/or training requirements to federally assisted construction already subject to OFC-approved construction industry minority hiring and/or training plans established pursuant to Executive Order 11246." 39 Fed.Reg. 2365 (January 21, 1974). The statement explains why the agency considered it necessary to promulgate the regulation, but gives no indication why providing thirty days notice of proposed rule making would prejudice the public interest. To the contrary, the very "interest" expressed supports the application of the thirty day requirement to this regulation to ensure those interested the right to contribute to the rule making process which the Administrative Procedure Act confers. 5 U.S.C. § 553(c).

The Act gives "interested persons an opportunity to participate in the rule making" (*id.*) *before* the proposed rule becomes effective. *Wagner Electric, supra*, 466 F.2d at 1020; *Kelly, supra*, 339 F.Supp. at 1101. The regulation at issue here provides for input after its effective date:

"In accordance with the spirit of the public policy set forth in 5 U.S.C. 553, interested persons are invited to submit written comments, suggestions, data, or arguments to Mr. Philip J. Davis, Director of the Office of Federal Contract Compliance, U.S. Department of Labor, Washington, D. C. 20210, on or before March 7, 1974. Material thus submitted will be evaluated and acted upon in the same manner as if this document were a proposal. Until such time as further changes are made, however, § 60–1.4 (b) as amended herein shall be in ef-

fect, thus permitting the public business to proceed more expeditiously." 39 Fed.Reg. 2365 (January 21, 1974). Permitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way. As *Kelly* states:

"We doubt that persons would bother to submit their views or that the Secretary would seriously consider their suggestions after the regulations are a *fait accompli*." 339 F.Supp. at 1101.

Despite the regulation's invocation of the good cause exception, the federal defendants urge us to uphold the validity of the regulation on a different ground. They now claim that § 553 does not apply to a regulation such as this, because § 553(a) states:

"This section applies, according to the provisions thereof, except to the extent that there is involved—

\*     \*     \*     \*     \*     \*

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts."

They rely on Housing Authority v. United States Housing Authority, 468 F.2d 1 (8th Cir. 1972), and Rodriguez v. Swank, 318 F.Supp. 289 (N.D.Ill.1970) (three judge court) aff'd mem., 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971).

The exemption relied on by defendants must be narrowly read to avoid "carv[ing] the heart out of the notice provisions of Section 553." *Housing Authority, supra*, 468 F.2d at 9. The legislative history supports the view that this exemption is a strictly limited one. The Senate Judiciary Report on the Administrative Procedure Act states: "It should be noted . . . that the exceptions apply only 'to the extent' that the excepted subjects are *directly* involved." S.Rep. 752, 79th Cong., 1st Sess. 13 (1945) (emphasis

**518**

added); *Housing Authority, supra,* 468 F.2d at 9.

█ However, we are not required to decide whether, under ordinary circumstances, § 553(a)(2) would exempt the January regulation from the procedures required by the remainder of that section for agency rule making, because it is inapplicable here for two reasons. First, the ground for dispensing with the thirty day notice which the federal defendants now put forward, based on the exception contained in § 553(a)(2), is different from the ground which they originally asserted in the regulation itself, which invoked § 553(b) and (d), an exception we found above to be inapplicable. The regulation's mere invocation of subsections (b) and (d) is an implied acceptance of the applicability of § 553 as a whole. In any event, as the Supreme Court stated in Securities Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947):

> "[A] simple but fundamental rule of administrative law . . . is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."

Second, the federal defendants are precluded from relying on § 553(a)(2), because the Department of Labor, the rule making agency involved here, has expressly waived its applicability. 29 CFR § 2.7 states:

> "It is the policy of the Secretary of Labor, that in applying the rule making provisions of the Administrative Procedure Act (5 U.S.C. section 553), the exemption therein for rules relating to public property, loans, grants,

benefits or contracts shall not be relied upon as a reason for not complying with the notice and public participation requirements thereof."

In light of the plain language of their own published policy statement, it is difficult to understand and impossible to accept the federal defendants' belated assertion that § 553(a)(2) excuses their failure to comply with the notice requirement of § 553.

█ For all of the reasons indicated above, the new regulation was invalidly promulgated and is, therefore, void and without legal effect.[3] As a result, the Brennan Memorandum has not been superseded, as the federal defendants claim (Memorandum at 20), and we turn to a consideration of its validity.

**B.**

█ Initially, we note that the Brennan Memorandum was never published in the Federal Register and, accordingly, is subject to the same infirmities as the new regulation. The fact that it is entitled "Memorandum to Heads of All Agencies" does not make it any the less an exercise of administrative rule making power if it has, as it does, "substantial impact" on the public. Lewis-Mota v. Secretary of Labor, 469 F.2d 478, 482 (2d Cir. 1972). The label which an agency attaches to its activities is not determinative and cannot be used to avoid compliance with § 553, when the agency is exercising its rule making powers. Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); *Lewis-Mota, supra,* 469 F.2d at 481–482; *Pharmaceutical Manufacturers, supra,* 307 F.Supp. at 863. Accordingly, the Memorandum is invalid as improperly promulgated.

The City, however, challenges the validity of the Brennan Memorandum on a different, and more substantial ground. It contends that the Memorandum is in-

---

3. This determination makes it unnecessary to decide whether the January regulation is in-

valid as an unauthorized preemption of local regulatory power.

valid as an unauthorized attempt to preempt local equal employment opportunity regulation.

The Brennan Memorandum states:

"Another problem which has hindered the uniform implementation of the construction industry contract compliance program has been the attempts by certain State and local governments to supplement Federal EEO Bid Conditions with additional EEO requirements in conflict with the Bid Conditions. Accordingly, administering agencies are directed to inform their grantees that where there is a viable and effective hometown or imposed construction industry plan in operation in a geographical area, additional and/or supplementary State or local EEO requirements may not be applied to Federally-assisted construction projects. This policy is applicable to all present and future grants of construction assistance."

Accordingly, it precludes, in absolute terms, all state and local equal employment requirements, regardless whether they are consistent with federally imposed or approved plans.

■ We believe it to be settled beyond dispute that the federal government has not preempted the entire field of equal employment regulation. Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc., 372 U.S. 714, 725, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963); Associated General Contractors of Massachusetts, Inc. v. Altshuler ("Altshuler"), 490 F.2d 9 (1st Cir. 1973) cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974). This is true even as to federally funded construction projects subject to the requirements of Executive Order No. 11246. *Altshuler, supra.* Indeed, in *Altshuler,* a case on all fours with ours, the Secretary of Labor himself stated, as amicus curiae, that the existence of the Boston hometown plan there in question did not preclude Massachusetts from imposing additional equal employment obligations on contractors engaged on federally funded public construction in the Boston area. 490 F.2d at 15. In the instant case, the federal defendants do adhere to the position which the Secretary of Labor took in *Altshuler* and they accept the propriety of the court's determination in that case that a local plan is not preempted by a federal program unless the two are inconsistent. (Memorandum at 13.) However, they maintain here that the Brennan Memorandum "was not, as the City contends . . ., designed to preempt absolutely state and local regulation of equal employment opportunities . . . [but] was intended to eliminate inconsistent local regulations." (*Id.*)

■ The difficulty with this interpretation is that it is at variance with the plain language of the Memorandum. Although the Memorandum states that the problem which it addresses is "the attempts by certain State and local governments to supplement Federal EEO Bid Conditions with additional EEO requirements in conflict with the Bid Conditions," the solution adopted is not to exclude only state and local equal employment requirements which are "in conflict" with federally approved or imposed plans, but to preclude state and local governments from applying *any* additional requirements to federally funded construction projects in areas with federal plans. The Memorandum states:

"Accordingly, administering agencies are directed to inform their grantees that where there is a viable and effective hometown or imposed construction industry plan in operation in a geographical area, additional and/or supplementary State or local EEO requirements may not be applied to Federally-assisted construction projects. This policy is applicable to all present and future grants of construction assistance."

Thus, the Memorandum unambiguously and absolutely preempts all state and local regulation of contractors on federally funded projects in the field of equal employment opportunity, and it is, accordingly, invalid on its face.

■ However, even accepting the federal defendants' limiting interpretation, the Memorandum is invalid as applied in this case. Since the federal government has not preempted the field of equal employment regulation in general, the Mayor's Plan may not be barred on the ground of preemption by the Executive Order and regulations thereunder, unless it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of [federal law]," Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L. Ed. 581 (1941), *accord*, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 141, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), Hill v. Florida, 325 U.S. 538, 542, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945); unless "there is . . . such actual conflict between the two schemes of regulation that both cannot stand in the same area," *Florida Lime & Avocado Growers, supra,* 373 U.S. at 141, 83 S. Ct. at 1217, Perez v. Campbell, 402 U.S. 637, 644, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); or unless "the purpose of the federal statute would to some extent be frustrated by the state statute," *Colorado Anti-Discrimination Commission, supra,* 372 U.S. at 722, 83 S.Ct. at 1026.

As the cases cited above indicate, the fact that federal and local requirements hold contractors to different standards does not necessitate a finding that the former preempt the latter, even if the latter were more stringent, unless compliance with the latter impairs the contractors' ability to conform to the former. Holding that a federally approved plan did not preempt a more stringent local plan, *Altshuler* stated:

"While we acknowledge that [the state plan] may be more demanding than the Boston [hometown] Plan, and may well involve higher administrative costs, there is no reason to suppose that contractors could not comply with both at the same time. By complying with [the state plan's] minority hiring goals on projects funded by both the state and the federal government, contractors would also comply with

the Boston [hometown] Plan's goals." 490 F.2d at 15.

The same analysis leads to the same conclusions here. The City's proposed plans and specifications do not impose the Mayor's Plan instead of, but as well as the New York Plan. Undeniably, the Mayor's Plan, like the state plan in *Altshuler,* is more demanding than the federal hometown plan, here the New York Plan. However, the two are not inconsistent, since compliance with the Mayor's Plan will not interfere with, but rather will constitute compliance with the New York Plan.

■ The New York Plan obliges the participating industries to place up to 1,000 minority persons in a training program annually, whereas the Mayor's Plan requires individual contractors to provide on-the-job training to one minority trainee for every four journeymen hired (a ratio which without question will cause the placement of at least 1,000 minority persons). In addition, the Mayor's Plan promotes a number of objectives, not covered by the New York Plan, including, for example, achieving specified minority manhour goals, advancement of minority members to journeymen pay scale and status and employment of minority-owned subcontractors. Furthermore, the Mayor's Plan provides for sanctions against contractors who do not make good faith efforts to comply with its requirements, whereas under the New York Plan mere agreement to abide by its provisions is deemed to constitute compliance.

A contractor's compliance with the requirements of the Mayor's Plan would not impede his industry's participation in the New York Plan. Indeed, we note that the federal defendants do not suggest any inconsistency or conflict between the two plans, and we do not find any. Consequently, the federal defendants' refusal to approve Red Hook's funding because of the City's adoption of the Mayor's Plan and its inclusion in Red Hook's plans and specifications is without basis in law. The Brennan

521

Memorandum, from which their action stems, is, as applied to this case, an unauthorized attempt to preempt valid local regulations.

Accordingly, the Brennan Memorandum is invalid on its face, as applied and as improperly promulgated. Invalidation of the new regulation and the Brennan Memorandum removes the sole bases for disapproving the inclusion of the Mayor's Plan in the plans and specifications for federally funded City contracts. Accordingly, the City is entitled to summary judgment granting the final injunctive and declaratory relief it requests.

## C.

We come finally to the City's motion for summary judgment against the state defendants. As discussed in Part III, *supra*, the state defendants' refusal to transmit the Red Hook amended plans and specifications, because of their inclusion of the Mayor's Plan, was unauthorized, since the U.S.E.P.A. regulations do not grant the transmitting state agency the power to determine the validity of a grantee's proposed equal employment requirements. In our earlier discussion, we were not required to decide the merits of the state defendants' claim that the Mayor's Plan was invalid because it did not accord with the New York Plan. We have since decided (Part IV, A and B, *supra*) that the two plans are consistent with each other, thus removing the basis for the state defendants' refusal to approve the Mayor's Plan for federal funding purposes. Accordingly, for both the reasons indicated above, we find the state defendants' actions to be improper, and the City is entitled to summary judgment against them.

In sum, the Memorandum to Heads of All Agencies, issued by Secretary of Labor Brennan on July 19, 1973, and the regulation promulgated on January 16, 1974 (41 CFR § 60–1.4(b); 39 Fed.Reg. 2365 (January 12, 1974)) are declared invalid. The state defendants are enjoined to reinstate the State Department of Environmental Conservation's acceptance of the Red Hook Plans and specifications. The federal defendants are enjoined from disapproving the City's plans and specifications and from terminating or withholding federal grant funds for Red Hook or other eligible City projects solely on the ground that they include the Mayor's Plan or that their affirmative action plan exceeds the requirements of the New York Plan.

Submit order on notice.