591 F.2d 896
 192 U.S.App.D.C. 287
 NATIONAL TOUR BROKERS ASSOCIATION, Petitioner,
v.
UNITED STATES of America and the Interstate Commerce
Commission, Respondents,
American Society of Travel Agents, Inc., High Adventure
Tours, Inc., Campus Travel, Inc., et al., American
Bus Association, Intervenors.
 No. 77-1501.
 United States Court of Appeals,
District of Columbia Circuit.
 
 Argued 27 Oct. 1978.
Decided 11 Dec. 1978.
 David I. Granger, Washington, D.C., with whom Harold D. Murry, Jr., Washington, D.C., was on the brief, for petitioner.
 Alan J. Thiemann, Atty., I.C.C., Washington, D.C., with whom Mark L. Evans, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I.C.C. and Robert L. Thompson, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 
 
 1
 Drew L. Carraway, John W. McFadden, Jr., Washington, D.C., John S. Fessenden, Arlington, Va., and Charles A. Webb, Washington, D.C., were on the brief, for intervenor, American Bus Association.
 
 
 2
 Robert E. Goldstein, New York City, was on the brief, for intervenor, Campus Travel, Inc., et al.
 
 
 3
 Also James H. Glavin, III, Waterford, N.Y., entered an appearance for intervenor, High Adventure Tours, Inc.
 
 
 4
 Also Paul S. Quinn, Washington, D.C., entered an appearance for intervenor, American Society of Travel Agents, Inc.
 
 
 5
 Also Robert B. Nicholson and Robert S. Burk, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondent, United States of America.
 
 
 6
 Before LUMBARD,* Senior Circuit Judge for the Second Circuit, and TAMM and WILKEY, Circuit Judges.
 
 
 7
 Opinion for the Court filed by WILKEY, Circuit Judge.
 
 WILKEY, Circuit Judge:
 
 8
 Petitioner seeks review of an order of the Interstate Commerce Commission (Commission or ICC) which prescribes new rules, and adopts new procedures, for the licensing of tour brokers.[1] Since we find that the Commission failed to comply with the procedural requirements of the Administrative Procedure Act, we vacate the order and rules prescribed thereunder, and remand to the Commission.
 
 I. BACKGROUND
 
 9
 On 22 September 1975 the Interstate Commerce Commission had published in the Federal Register a Notice and Order[2] which provided, in pertinent part, as follows:
 
 ENTRY CONTROL OF BROKERS
 Notice of Proceeding
 
 10
 Purpose: The Interstate Commerce Commission has always endeavored to review the current extent of its jurisdiction over the surface transportation industry And to propose to the Congress appropriate legislation which would alter that jurisdiction, pursuant to the provisions of the Interstate Commerce Act. The purpose of this document is to institute a proceeding to investigate the need for continued regulation of brokers of property and passengers, operating in interstate or foreign commerce, And to consider what, if any, legislative amendments of Section 211 of the Act ought to be recommended to the Congress.
 
 
 11
 It is ordered, That based on the reasons set forth in the attached notice, a proceeding be, and it is hereby, instituted (1) for the purposes of investigating the present licensing requirements for brokers of property and passengers, operating in interstate or foreign commerce, And (2) for the possible formulation of legislation which would amend Section 211 of the Interstate Commerce Act for subsequent recommendation to the Congress.
 
 
 12
 I. On July 7, 1975, the Interstate Commerce Commission announced the results of an internal staff study of the Agency's operations. The unprecedented "Blue Ribbon Staff Study Panel" made four reports to the Commission, including over 60 recommendations for internal, procedural, and substantive reform. Among these was the recommendation that Section 211 of the Interstate Commerce Act be amended so as to eliminate entry control requirements for broker licenses.
 
 
 13
 (I)n light of the study panel's recommendation and our continuing interest in scrutinizing the scope of this Commission's regulatory jurisdiction, we deem it in the public interest to institute this proceeding to consider (1) the need for and effectiveness of Section 211 of the Interstate Commerce Act in its present form, And (2) any possible legislative amendments to that section which should be proposed to the Congress.
 
 
 14
 This Commission, however, would appreciate the views, comments, and suggestions of any interested parties relating to the above inquiries And to any possible, pertinent, and constructive legislation we may propose to the Congress in this area.
 
 
 15
 A period of comment followed, during which written statements were received. The Commission then closed the record but, upon request from National Tour Brokers Association (NTBA), reopened the proceeding to hear oral argument on 9 August 1976.[3]
 
 
 16
 In April of the following year, rather than proposing legislative changes to Congress, the Commission issued final rules involving both substantive and procedural changes with regard to the licensing of tour brokers.[4]
 
 
 17
 On 8 July 1977 NTBA filed a "Petition to Reconsider and Vacate Report and Order and for Further Relief" (Petition for Reconsideration). This petition alleged six specifications of error, the first of which was:
 
 
 18
 (A) That the purported Notice initiating the proceeding, later characterized by the Commission as a notice of proposed rulemaking, failed to comply with the Administrative Procedure Act and the requirements of constitutional due process; . . .[5]
 
 
 19
 By order served 26 August 1977, the Commission denied the Petition for Reconsideration, disagreeing with each specification of error.[6]
 
 
 20
 NTBA is now before this court seeking review of the Commission's action.[7]
 
 II. ANALYSIS
 
 21
 We hold that in this case the ICC failed to comply with the notice requirements of the Administrative Procedure Act. Section 4(a) of the Act (5 U.S.C. § 553(b)) provides:
 
 
 22
 General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include
 
 
 23
 (1) a statement of the time, place, and nature of public rule making proceedings;
 
 
 24
 (2) reference to the legal authority under which the rule is proposed; and
 
 
 25
 (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
 
 A. Constructive Notice
 
 26
 The first clause of § 553(b) provides for constructive notice: "General notice of proposed rule making shall be published in the Federal Register." We are unable to find that the Commission satisfied this requirement.[8] It is true that the Commission published a general notice in the Federal Register, but it was not a notice of proposed rulemaking. A fair reading of that item clearly indicates that it was one looking toward the formulation of possible legislative amendments which might be proposed to Congress, not administrative rulemaking. It seems that the Commission changed its mind halfway through this proceeding[9] and is now attempting to correct its procedural deficiencies by characterizing the proceeding Ex post facto as informal rulemaking. If this court were to countenance such procedure in this case, it is difficult to see where the line would ultimately be drawn. The constructive notice requirement of § 553(b) would be gutted of virtually all its meaning. Agencies could in the future publish vague, ambiguous notices in the Federal Register, adverting obliquely to certain issues or proceedings, and then, months or years later, promulgate final rules and claim that constructive notice had been given. This cannot be the objective of the APA notice requirement.[10]
 
 
 27
 The purpose of this requirement is clear to put interested parties on notice that Administrative rulemaking in certain areas is about to take place. We hold that the Commission failed to meet this requirement in this case.
 
 
 28
 This alleged "notice" also did not provide, as required by § 553(b)(2), a "reference to the legal authority under which the rule is proposed." Such a reference would have included something along the lines of what the Commission Did include when it promulgated its final rules, a year and a half later. Therein it stated, "The rule is issued under the authority of 49 U.S.C. 302, 303, 304, 305, 311, and 320, and 5 U.S.C. 553 and 559."[11] In the original notice which was published on 22 September 1975,[12] the only statutory section mentioned is § 211 of the Interstate Commerce Act.[13] Reference to this section alone is insufficient, and, in any event, this section was not referred to as "the legal authority under which the rule is proposed." It was referred to solely as a statute then in existence which might need to be altered or amended.
 
 
 29
 We also find that the Commission did not comply with § 553(b)(3), which requires that "(t)he notice . . . include . . . either the terms or substance of the proposed rule or a description of the subjects and issues involved." Certainly the Commission did not include "the terms or substance of the proposed rule." However, the Commission argues that certain references in the notice were an adequate "description of the subjects and issues involved."[14] Our response is that, while this May[15] have been an adequate description of the subjects and issues involved for purposes of suggestions for legislative changes, it was not adequate for purposes of subsequently promulgated administrative rules. "Description(s) of subjects and issues" are of very little use to interested parties unless such parties are accurately apprised of the Purpose of the proceeding in which those subjects and issues are being aired. The attitude one takes towards issues may vary considerably depending on the context in which those issues are placed. The legislative change sought in this case was basically an expansion of the authority of the ICC,[16] while the administrative rules later issued addressed much more specific subjects such as territorial restrictions and bond amounts.[17]
 
 
 30
 We cannot accept the effort of the ICC retroactively to characterize its "Notice of Proceeding" as suggesting the alternatives of recommending legislation Or rulemaking. At the outset we quoted the Notice in some detail, emphasizing the repeated references to legislative amendments to Section 211 to be proposed, an objective beyond the scope of rulemaking. The ICC argues that the reference to legislation was in each instance preceded by reference to the subject matter of the (no adjective) "Proceeding," and that this was "Notice" of Rulemaking. Whatever it was Notice of, it was not Notice of Rulemaking, for:
 
 
 31
 (1) in all five quoted paragraphs (and throughout the Notice) the word "Rulemaking" is not used;
 
 
 32
 (2) the connective between the first reference and the reference to proposed legislation is, in each instance, "and", not "or", hence there is no "alternative" to legislation mentioned; and
 
 
 33
 (3) all the other references, fairly considered, are only general descriptions of the subject to be discussed, with the ultimate procedural objective to be legislation.
 
 
 34
 With specific attention to § 553(b)(3), naturally, the better course for the agency to follow is to publish in advance the "terms or substance" of the proposed rule. This allows the parties to direct their comments toward concrete proposals, not amorphous subject areas. Such an approach is designed to generate a focused inquiry by both the agency and the parties.[18] To the extent the agency descends to the particulars in its "description of the subjects and issues involved," it more clearly complies with § 553(b)(3).
 
 B. Actual Notice
 
 35
 Section 553(b) allows the alternative of actual notice: ". . . unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law."
 
 
 36
 The Commission claims that actual notice was given to the parties at the oral hearing held 9 August 1976. The Commission's Chairman opened that hearing by outlining some of the questions the Commission hoped to resolve, among which was, "(I)f the Commission does decide that entry controls are no longer necessary, should we seek legislation or is some other course of action available?"[19] This is clearly not a statement that a rulemaking proceeding is taking place. Rather, it is an inquiry asking whether it would be advisable to undertake a rulemaking proceeding. The statement of NTBA's counsel later at that hearing, in response to the Chairman's introductory remarks, was in conformity with this meaning. Counsel stated:
 
 
 37
 Now, our position is this. We urge (the Commission) not to submit to Congress legislative recommendation for change in Section 211. We also urge that you not attempt a change in Section 211 administratively.[20]
 
 
 38
 Counsel was simply stating that it did not think that an administrative rulemaking proceeding should be initiated. It was not an implicit concession that a rulemaking proceeding was then underway.
 
 
 39
 The Commission's final argument, a rather ingenious one, is that the promulgation of the final rules[21] constituted "notice," the period of reconsideration was the "comment" period, and the order denying reconsideration amounted to promulgation of final rules.[22] However, this "realignment" argument must fall for several reasons, both statutory and policy.
 
 
 40
 First, § 553(b) speaks quite specifically about "proposed" rules, and a "final" rule simply cannot be a "proposed" rule. For example, § 553(b)(2) requires that the notice include "reference to the legal authority under which the rule is Proposed " (emphasis added). Here, a year and a half later, we have reference to the legal authority under which the Final rule was Promulgated.[23]
 
 
 41
 Of even greater importance, though, is the purpose behind the requirement that the parties be able to comment on the rule while it is still in the formative or "proposed" stage. The purpose is both (1) to allow the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule, and (2) to see to it that the agency maintains a flexible and open-minded attitude towards its own rules, which might be lost if the agency had already put its credibility on the line in the form of "final" rules. People naturally tend to be more close-minded and defensive once they have made a "final" determination.[24]
 
 
 42
 This is supported by relevant precedent. With regard to the first point, it is stated that the purpose of § 553 is to "enable( ) the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated."[25] With regard to the second point, "We doubt that persons would bother to submit their views or that the Secretary would seriously consider their suggestions after the regulations are a Fait accompli."[26] With regard to the points generally, the Third Circuit, in the face of a claim that the opportunity to petition for the amendment or repeal of a final rule should cure defective notice, stated emphatically:
 
 
 43
 Section 4(b) of the Administrative Procedure Act (5 U.S.C. § 553(b)) requires notice Before rulemaking, not after. The right of interested persons to petition for the issuance, amendment or repeal of a rule, granted in Section 4(e) of that Act (5 U.S.C. § 553(e)), is neither a substitute for nor an alternative to compliance with the mandatory notice requirements of Section 4(b). (Emphasis original.)[27]
 
 
 44
 Perhaps the basic difficulty with the ICC's "realignment" argument is that in reality it is now defending a procedure conducted in inverse order from that contemplated by the APA. The order of procedure must be, first, to notice the proposed rule, Then to receive the comments and evidence directed toward this proposed rule, and, finally, to promulgate the final rule. It simply will not do to redesignate the final rule as notice and claim the proceeding started from there, because it obviously did not. Nor can it be claimed that proposed legislation was the equivalent of a proposed rule, because no specific proposed legislation was ever formulated (nor was there any obligation on the ICC to do so, if legislation was what it had in mind, as it announced).
 
 
 45
 The deficiencies in an approach whereby the agency issues final rules before it receives (and benefits from) comments and input from the parties is graphically illustrated in the instant proceeding. In its initial decision promulgating the final rules here in issue, the Commission stated that(i)n all but a few cases, such bonds (I. e., tour broker surety bonds) will be written on a full collateral basis only, I. e., the broker must post with the surety company the coverage amount in cash or acceptable investment bonds. . . . Surety companies, even before issuing bonds on a full collateral basis, thoroughly investigate a bond applicant as to reputation, integrity, business ability, and financial stability. The possibility of questionable fly-by-night brokers is thereby all but eliminated.[28]
 
 
 46
 As pointed out by petitioner[29] the Commission may be in serious error about how tour broker surety bonding actually works. An NTBA survey in May 1977 indicated that 85% of the members responding said that their insurance company Did not require collateral backing for the bonds required by the Commission.[30] Secondly, little investigation is pursued before the bond is issued, since a $5,000 or $10,000 bond is such an insignificant amount of business to most insurance companies.[31] The average annual cost to the tour broker for a $5,000 bond is $56.78, which would not cover the cost of more than minimal investigation.[32]
 
 
 47
 What may be rather serious errors on the part of the Commission with regard to substantive matters demonstrate to us that a reexamination of the whole area, properly focused from the start by a proposed rule, would not be a fruitless endeavor at all. It may be that the Commission in a new and properly focused inquiry will find, for example, that it needs to make more stringent requirements as to the fitness of newly licensed tour brokers, and that these stringent requirements will satisfy the questions (or fears) the present tour brokers have about the admission of an additional large number of brokers. We do not say the Commission should reach such a conclusion, only that we believe the Commission's ultimate conclusion may be different in several respects after a properly conducted new proceeding.
 
 
 48
 In conclusion, since we find that the Commission failed to comply with the relevant requirements of the APA, the order and rules at issue in this case are vacated and this case is remanded to the Commission for further proceedings not inconsistent with this opinion.
 
 
 49
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(c)
 
 
 [1]
 Entry Control of Brokers, 126 M.C.C. 476 (1977), pet. for reconsideration denied, Ex parte No. MC-96 (26 Aug. 1977), J.A. at 43-161. Tour brokers are persons who arrange for the transportation of passengers and property by carrier. The ICC regulates only those brokers who arrange for transportation by motor carrier. See Entry Control of Brokers, at 478, J.A. at 46
 
 
 [2]
 40 Fed.Reg. 43566-67, J.A. at 42 (emphasis supplied)
 
 
 [3]
 See Brief for Petitioner at 4
 
 
 [4]
 The decision was issued on 8 April 1977 and served 26 April 1977. The final rules were published in the Federal Register on 29 April 1977, 42 Fed.Reg. 21782-84. J.A. at 130-132. Among other things, the Commission prospectively eliminated the determination on a case-by-case basis as to whether the issuance of a broker license is consistent with the public interest
 
 
 [5]
 See Brief for Petitioner at 5 n. 4. The other points, which we do not find it necessary to treat herein, were:
 (B) That documents and data relied upon by the Commission during its deliberations in this case should have been placed on the public record for comment;
 (C) That the Commission arbitrarily ignored the substantive and procedural requirements of the National Environmental Policy Act;
 (D) That the Commission's action in removing the "public interest" test for tour broker licensing was contrary to the Interstate Commerce Act, its legislative history and case law precedent;
 (E) That the Commission's action was contrary to the National Transportation Policy as it was inconsistent with the needs of tour brokers, motor coach operators, and the public; and
 (F) That the Commission's actions, findings and conclusions were arbitrary and capricious on the record and were otherwise unlawful.
 
 
 [6]
 J.A. at 133-161
 
 
 [7]
 On 3 June 1977 NTBA filed its initial petition for review. This petition was amended on 19 September 1977 to include the Commission's order denying reconsideration. See Brief for Petitioner at 6
 
 
 [8]
 The requirement is in the alternative. The alternative of actual notice is discussed at text following note 18 Infra
 
 
 [9]
 From thinking that it needed a statutory change before it could dispense with the "public interest" element, to deciding that it would dispense with that requirement administratively through rulemaking. See Reply Brief for Petitioner at 11-12
 
 
 [10]
 The ICC certainly knew how to give proper notice. See, for example, the Commission Notice published just six weeks earlier concerning redefinition of commercial zones and terminal areas for motor carriers and freight forwarders, which contains within its concluding sentence the following: "This notice of proposed rulemaking is issued under the authority of sections 552, 553, and 559 of the Administrative Procedure Act . . . ." 40 Fed.Reg. 33840, 33841 (1975). J.A. at 313, 314
 
 
 [11]
 42 Fed.Reg. 21782 (1977). J.A. at 130
 
 
 [12]
 40 Fed.Reg. 43566-67. J.A. at 42
 
 
 [13]
 Codified at 49 U.S.C. § 311 (1970)
 
 
 [14]
 See Brief for Respondents at 52-53, wherein the following language from the Notice is pointed out:
 we deem it in the public interest to institute this proceeding to consider (1) The need for and effectiveness of section 211 of the Interstate Commerce Act in its present form, And (2) any possible legislative amendments to that section which should be proposed to the Congress (emphasis added).
 Brief for Respondents at 52.
 (The panel) was of the view that no urgent (sic; cogent) reason existed for requiring an applicant to establish that the proposed service would be consistent with the public interest and the national transportation policy as a prerequisite to obtaining authority to operate as a broker. The study panel, therefore, concluded that the public interest would be adequately protected by having applicants for broker licenses merely demonstrate their fitness to operate in order to obtain said license, after which they would be subject to other statutory requirements of bonding, record maintenance, etc., and to Commission rules and regulations.
 Brief for Respondents at 53. In inverted order from 40 Fed.Reg. 43566-67 (1975). J.A. at 42.
 This is the greatest specificity the Commission claims to have achieved. We do not think it was enough.
 
 
 [15]
 But see Brief for Petitioner at 18: "The Commission's notice made no mention of promulgating regulations, no mention of master licenses, no mention of doubling the amount of the bond and no mention of abolishing territorial restrictions in licenses."
 
 
 [16]
 By allowing the Commission to license tour brokers without first making an individualized determination that each licensing would "be consistent with the public interest and the national transportation policy declared in this Act." 49 U.S.C. § 311(b) (1970). See Brief for Petitioner at 10-14
 
 
 [17]
 See note 15 Supra
 
 
 [18]
 See Home Box Office, Inc. v. FCC, 185 U.S.App.D.C. 142, 169, 567 F.2d 9, 36 (1977): "(A)n agency proposing informal rulemaking has an obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible."
 
 
 [19]
 See Reply Brief of Petitioner at 12-13, quoting Document 281 of Certified Index to Record, Vol. 1-B, at 5
 
 
 [20]
 Document No. 281, Certified Index to Record, 71, quoted in Brief for Respondents at 57
 
 
 [21]
 The Commission argues that the rules served on 26 April 1977 and published in the Federal Register on 29 April 1977 (42 Fed.Reg. 21782-84, J.A. at 130-32) were not "final" rules. However, they were labeled "final rule(s)" (See 42 Fed.Reg. 21782 (1975), J.A. at 130) and were treated in every respect like final rules. We see no merit in such a position
 
 
 [22]
 This is the substance of the argument contained in Brief for Respondents at 57-61
 
 
 [23]
 See text accompanying note 11 Supra
 
 
 [24]
 Another reason is noted by Vice Chairman Clapp, joined by Commissioner Hardin, dissenting in part from the promulgation of these rules, Entry Control of Brokers, 126 M.C.C. 476, 531 (1977), J.A. at 99:
 (A)n individual should, I believe, have an opportunity to address a proposal before, not after, a decision on whether it should be implemented has been made. The fact that the matter has been prejudged might very well discourage disclosure of pertinent points of view. For example, someone might be inclined to respond to an initial proposal because this could be done without the aid of professional advice. But he or she might not be similarly inclined to file a petition responding to the proposal's adoption because of a belief that to do so would require such advice.
 
 
 [25]
 Texaco, Inc. v. FPC, 412 F.2d 740, 744 (3rd Cir. 1969)
 
 
 [26]
 Kelly v. United States Department of Interior, 339 F.Supp. 1095, 1101 (E.D.Cal. 1972)
 
 
 [27]
 Wagner Electric Corp. v. Volpe, 466 F.2d 1013, 1020 (3rd Cir. 1972)
 
 
 [28]
 Entry Control of Brokers, 126 M.C.C. 476, 500 (1977), J.A. at 68
 
 
 [29]
 Brief for Petitioner at 44-48
 
 
 [30]
 J.A. at 205. The Joint Appendix at this point reprints a study conducted by Arthur D. Little, Inc
 
 
 [31]
 Id
 
 
 [32]
 Id. The study concludes, "(T)he protection of the consumer is regarded as negligible by both tour brokers and insurance representatives." Id