**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number:_____**

**Filing Date:  March 17, 2016**

**NO. S-1-SC-34933**

**NEW MEXICO EXCHANGE CARRIER GROUP,**

Appellant,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

Appellee,

and

**SMITH BAGLEY, INC. and
NAVAJO COMMUNICATIONS COMPANY,**

Intervenors.

**<u>CONSOLIDATED WITH</u>**

**NO. S-1-SC-35036**

**NEW MEXICO EXCHANGE CARRIER GROUP,**

Appellant,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

Appellee,

and

**SPRINT COMMUNICATIONS COMPANY, L.P.; SPRINT SPECTRUM, L.P.; SMITH BAGLEY, INC.; CTIA, THE WIRELESS ASSOCIATION; T-MOBILE WEST LLC; and NAVAJO COMMUNICATIONS COMPANY,**

        Intervenors.

**APPEAL   FROM   THE   NEW   MEXICO   PUBLIC   REGULATION COMMISSION**

Comeau, Maldegen, Templeman & Indall, LLP
William Phelps Templeman
Joseph Edward Manges
Santa Fe, NM

for Appellant New Mexico Exchange Carrier Group

Russell R. Fisk
Margaret Kendall Caffey-Moquin
Santa Fe, NM

for Appellee New Mexico Public Regulation Commission

Cuddy & McCarthy LLP
Patricia Salazar Ives
Santa Fe, NM

Lukas, Nace, Gutierrez & Sachs, LLP
David LaFuria
McLean, VA

for Intervenors Smith Bagley, Inc. and Navajo Communications Company

Lewis Roca Rothgerber LLP
Jeffrey H. Albright
Albuquerque, NM

for Intervenors Sprint, T-Mobile, and CTIA, The Wireless Association

**OPINION**

**CHÁVEZ, Justice.**

{1}    In this opinion we address two orders issued by the New Mexico Public Regulation Commission (PRC) that affect the revenues of local telephone networks including rural telephone companies that make up the New Mexico Exchange Carrier Group. The first order is an annual order that must be issued by the PRC on or before October 1 each year that adopts a Surcharge Rate for the succeeding year. The Surcharge Rate is paid by consumers of all telephone communication services, both wired and wireless. The surcharge that is collected is placed in a State Rural Universal Service Fund (Fund) and distributed to local telephone networks. We will refer to this order as the "Surcharge Rate Order." On September 17, 2014, the PRC issued the Surcharge Rate Order, which adopted a 3% Surcharge Rate for calendar year 2015.

{2}    The second order is a Rule Order that amends the 2005 rules which set forth the procedures for administering and implementing the Fund. The Rule Order was issued on November 26, 2014; the rule changes became effective on January 1, 2015. *See* 17.11.10.6 NMAC. We begin our analysis with a discussion of the Fund's background, followed by a discussion of the issues on appeal regarding each order and our reasons for reversing the PRC and remanding for further proceedings.

# I. THE STATE RURAL UNIVERSAL SERVICE FUND

{3} Long-distance telephone carriers rely on local telephone networks on both ends of a long-distance telephone call to complete the long distance call. Some of these local networks are owned by Incumbent Local Exchange Carriers (ILECs), including numerous rural telephone companies that make up the N.M. Exchange Carrier Group. ILECs are owners of public switched telephone networks. *See* John Gasparini, *Hello, Congress? The Phone's For You: Facilitating the IP Transition While Moving Toward a Layers-Based Regulatory Model*, 67 Fed. Comm. L.J. 117, 123 n.25 (2014); 47 U.S.C. § 251(h) (2012). When someone places a call, the caller's ILEC transports the call to the long-distance carrier's network, which in turn transports the call for some distance before transferring the call to another ILEC on the receiving end. *See* Mark D. Schneider, Marc A. Goldman, & Kathleen R. Hartnett, *The* USTA *Decisions and the Rise and Fall of Telephone Competition*, 22 Comm. Law., Summer 2004, at 1, 18. Long-distance carriers pay access charges to compensate ILECs for using their networks. The PRC regulates access charges that ILECs receive for *intrastate* long-distance calls, and the Federal Communications Commission (FCC) regulates access charges that ILECs receive for *interstate* long-distance calls and wireless calls. *See* NMSA 1978, § 63-9H-6(I) (2013); *see also* 47 U.S.C. §§ 151, 614 (2012); 47 C.F.R.

§ 61.26 (2012).

{4} In 1996, the FCC required ILECs to lower their access charges for interstate service. However, to compensate ILECs for the reduction in access-charge revenue, the FCC directed payments to ILECs from a federal universal service fund. *See In re Fed.-State Joint Bd. on Universal Serv.*, 12 F.C.C.R. 8776, 8780-86 (1997), *aff'd in part, rev'd in part sub nom. Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999). The PRC did not immediately follow the FCC's lead, and instead continued to allow ILECs to charge high intrastate access rates, which meant that New Mexico customers paid more for intrastate long distance calls than for interstate long distance calls.

{5} However, effective July 1, 1999, the Legislature enacted the Rural Telecommunications Act of New Mexico (the Act), NMSA 1978, §§ 63-9H-1 to -14 (1999, as amended through 2013), and directed the PRC to establish and administer a " 'state rural universal service fund,' " Section 63-9H-6(A), with a "surcharge on intrastate retail public telecommunications services to be determined by the [PRC]." Section 63-9H-6(B). The Legislature delegated broad authority to the PRC over the Fund.

The [PRC] shall:

3

    (1) establish eligibility criteria for participation in the fund consistent with federal law that ensure the availability of service at affordable rates. . . .;

    (2) provide for the collection of the surcharge on a competitively neutral basis and for the administration and disbursement of money from the fund;

    (3) determine those services requiring support from the fund;

    (4) provide for the separate administration and disbursement of federal universal service funds consistent with federal law; and

    (5) establish affordability benchmark rates for local residential and business services that shall be utilized in determining the level of support from the fund. The process for determining subsequent adjustments to the benchmark shall be established through a rulemaking.

Section 63-9H-6(D).

{6} Later in 2005, the New Mexico Legislature amended the Act to require equal access charges for intrastate and interstate calls, which were to be set at the rate established by the FCC for interstate calls. *See* § 63-9H-6(I) (requiring a phase-in of equal charges by May 1, 2008). Like the FCC, the New Mexico Legislature determined that the ILECs' lost revenue for intrastate calls would be replaced with a combination of (1) limited increases in local rates up to an "affordability benchmark," and (2) subsidy payments to ILECs from the Fund. *See* § 63-9H-6(A),

4

(D), (K). The Fund is financed by a surcharge on intrastate retail telephone service, which telecommunications carriers collect from their customers. *See* § 63-9H-6(B). All telephone companies operating in New Mexico, wired and wireless alike, charge their consumers the Surcharge Rate, and these monies are placed into the Fund and paid out to ILECs. *See* 17.11.10.20 & 17.11.10.22 NMAC.

{7}     The PRC adopted regulations implementing the 2005 Act amendments. 17.11.10.8 to -30 NMAC (11/30/05, as amended through 12/28/05). The regulations required the size of the Fund to be set annually and to be "equal to the sum of [the ILECs'] revenue requirements . . . plus projected administrative expenses and a prudent fund balance." 17.11.10.19(A), (C) NMAC (citation omitted). The PRC defined each ILEC's revenue requirement as the amount of revenue the ILEC lost as a result of the intrastate access charges. *See* 17.11.10.19(E) NMAC. The PRC then determined that the size of each ILEC's revenue requirement—i.e., subsidy payment—should be calculated using the number of intrastate access minutes that the ILEC recorded in 2004. *See id.* The regulation remained unchanged from the end of 2005 to 2013, and each ILEC received a subsidy payment based on an equation that used its 2004 access minutes. *See id.*

{8}     The PRC also appointed Solix, Inc. (Solix) to serve as a third party fund

administrator pursuant to Section 63-9H-6(G) and 17.11.10.10 NMAC. Solix is responsible for the collection, administration, and disbursement of the Fund subject to the PRC's supervision and approval. *See* § 63-9H-6(G); 17.11.10.12 NMAC. Each year Solix submits a report to the PRC that offers a range of options for the Fund size and the Surcharge Rate for the following year as required by Section 63-9H-6(M), 17.11.10.19(A) NMAC, and 17.11.10.12(E) NMAC. The PRC has the ultimate responsibility to decide the amount of the Fund and the Surcharge Rate. *See* 17.11.10.19(B) & 17.11.10.20(B) NMAC; *see also* § 63-9H-6(A), (C). The regulations that governed the administration of the Fund from 2004 up to and including the Surcharge Rate Order at issue in this case requires the Fund size to be "equal to the sum of each [eligible ILEC's] revenue requirement[] . . . plus projected administrative expenses and a prudent fund balance." 17.11.10.19(C) NMAC.

> [T]he revenue requirement for each [ILEC] . . . shall be equal to the [eligible ILEC's] applicable [2004] intrastate access minutes multiplied by the difference between the allowable intrastate access rate . . . and the [eligible ILEC's] historical intrastate access rate, with the product of this computation multiplied by the [eligible ILEC's] historical collection factor, and then reduced by the [eligible ILEC's] imputed benchmark revenue. . . .[1]

---

[1]Historically the formula has been represented arithmetically as "((Historical Rate Minus Allowable Rate) Times minutes Times Collection Factor) Minus Imputed Benchmark Revenue." 17.11.10.19(E) (2005).

17.11.10.19(E) NMAC (citation omitted).

{9} However, because of the expansion of wireless services, e-mail, text messaging, social media, and other new internet-based video and telephone communications, the use of wired telephone services has declined significantly. *See* Kevin Werbach, *Reflections on Network Transitions and Social Contracts for the Broadband World*, 13 Colo. Tech. L.J. 45, 46, 57 (2015). In New Mexico, there was an approximately 40% decline in access minutes occurring from 2004 through 2012. On November 27, 2012, the PRC issued a Notice of Proposed Rulemaking to address possible amendments to the Fund rules, to, among other things, change the Fund formula to apply 2012 access minutes instead of 2004 access minutes and to establish a 3% surcharge cap. While the PRC was considering these rule changes, in 2013 the Governor signed into law House Bill 58, Chapter 194, Section 4 of New Mexico Laws of 2013, which amended NMSA 1978, Section 63-9H-6(J) (2005) and required the PRC to "establish a cap on the surcharge." Section 63-9H-6(J).

{10} It was against this backdrop that the PRC issued the November 26, 2014 Rule Order, which set the surcharge cap and amended the formula for calculating the Fund, effective January 1, 2015. The relevant details of the process involved in adopting the Rule Order will be described in the discussion of the merits of the N.M. Exchange

7

Carrier Group's appeal of the Rule Order. However, because the amended regulations did not apply to the Surcharge Rate Order, we will first discuss the merits of the N.M. Exchange Carrier Group's appeal of the Surcharge Rate Order.

## II.   THE SURCHARGE RATE ORDER CASE (NMPRC Case No. 14-00279-UT; New Mexico Supreme Court Case No. S-1-SC-34933)

{11}   On September 17, 2014, a three to two majority of the PRC issued the Surcharge Rate Order adopting a 3% Surcharge Rate and a Fund amount of approximately $21 million for calendar year 2015. On appeal, the N.M. Exchange Carrier Group contends that the Surcharge Rate Order is arbitrary and capricious because the PRC did not adhere to the regulations in existence at the time of its issuance of the Order, but rather anticipated what it might do with respect to amending the funding formula and establishing a surcharge cap in the Rule Order case. The N.M. Exchange Carrier Group emphasizes that had the PRC adhered to the existing regulations it could not have adopted a 3% Surcharge Rate because doing so results in a projected deficit of $3,870,813 at the end of 2015—a clear violation of 17.11.10.19(C) NMAC, which requires the Fund to have "a prudent fund balance." The N.M. Exchange Carrier Group also contends that the Surcharge Rate Order is not supported by substantial evidence because the Fund administrator (Solix), the PRC's Fund Advisory Board, and the PRC's own counsel agreed that a 3.62% Surcharge

Rate was the appropriate rate and would result in a Fund size of $25,057,152 with a projected net balance of $327,153 at the end of 2015.

{12}  In response, the PRC contends that the 2013 legislative amendments to the Act required the PRC to cap the Surcharge Rate, and the 3% Surcharge Rate is supported by substantial evidence because the 3.62% rate recommended by Solix, the Fund Advisory Board, and PRC general counsel would have been the highest in the history of the Fund, which would conflict with the PRC's responsibility under Section 63-9H-6(J) to keep the Surcharge Rate to a minimum. As evidence of the latter point, the PRC refers us to *In re Implementation of the State Rural Universal Service Fund*, NMPRC Case No. 06-00026-UT, for each of the orders setting a Surcharge Rate beginning in calendar year 2007. The Surcharge Rates from calendar years 2007 through 2014 were as follows:

> 2007 = 3.0%
> 2008 = 2.5%
> 2009 = 2.15%
> 2010 = 2.45%
> 2011 = 3.00%
> 2012 = 3.30%
> 2013 = 3.45%
> 2014 = 3.45%

Utilizing this evidence, the PRC argues that "the 3% surcharge rate [it adopted for 2015] is *higher* than the median of the surcharge rates previously set by the [PRC],

9

which was 2.725%, and higher than the average of those rates, which was 2.9125%."

{13} A party challenging a PRC order must establish that the order is "arbitrary and capricious, not supported by substantial evidence, outside the scope of the agency's authority, or otherwise inconsistent with law." *N.M. Indus. Energy Consumers v. N.M. Pub. Regulation Comm'n*, 2007-NMSC-053, ¶ 13, 142 N.M. 533, 168 P.3d 105 (internal quotation marks and citation omitted); *see also* NMSA 1978, § 63-9H-13(B) (1999). Under NMSA 1978, Section 63-9H-11 (2013), we must uphold a PRC order if the order substantially complies with the Act.

{14} The annual determination of the Fund is governed by 17.11.10.19 NMAC as it existed before the 2015 amendments. *See Gen. Tel. Co. of Sw. v. Corp. Comm'n* (*In re Gen. Tel. Co. of Sw.*), 1982-NMSC-106, ¶ 29, 98 N.M. 749, 652 P.2d 1200 (stating that an agency is bound by its existing rules and regulations). "The administrator[, Solix,] shall determine the amount of the fund annually, subject to [PRC] approval, on or before October 1 of each year . . . ." 17.11.10.19(A) NMAC (2005). "The amount of the fund shall be equal to the sum of each [eligible ILEC's] revenue requirements, calculated pursuant to this section . . . plus projected administrative expenses and a prudent fund balance." 17.11.10.19(C) NMAC (2005). Although the Legislature amended the Act in 2013 to require the PRC to establish a

cap on the surcharge, the required cap is the subject of the Rule Order case docketed as 35,036, not case no. 34,933, the Surcharge Rate Order case. The Surcharge Rate Order was issued on September 17, 2014. Final comments in the Rule Order case were not due until September 19, 2014, a public hearing was not scheduled until October 1, 2014, and the record was not closed until October 15, 2014. The PRC still did not have all of the evidence in the Rule Order case, and therefore it was not in a position to make a decision regarding what cap to impose on the Surcharge Rate in future years. Moreover, the prospective cap is irrelevant to the Surcharge Rate Order because even the 2015 rule amendments require that the annual surcharge be large enough to include "a prudent fund balance." *Compare* 17.11.10.19(C) NMAC (2005) *with* 17.11.10.19(C) NMAC (2015).

{15} Historically Solix had recommended that the PRC maintain an annual Fund balance of approximately $2 million, which represents the cost of operating the Fund for one month. In 2012, the PRC for the first time rejected Solix's rationale for maintaining a Fund balance of approximately $2 million because "the rule only calls for a 'prudent' contingency." Accordingly, for calendar year 2013 the PRC approved a 3.45% Surcharge Rate—less than the 3.5 to 3.6% rate suggested by Solix and the PRC Advisory Board—which resulted in a $1.5 million dollar surplus to begin

calendar year 2013. This was the first time the Fund's surplus had been less than $2 million. The Fund surplus to begin calendar year 2015 was projected to be $875,660.

{16}     The PRC's justification for approving a 3% Surcharge Rate for 2015 was the 2013 amendment to the Act, as well as the fact that the 3% rate is higher than the median or average rates since 2008. However, the amendment to the Act does not specify a formula to be used by the PRC in calculating the eligible ILECs' revenue requirements, *see* 2013 N.M. Laws, ch. 294, § 4; the amended formula is the subject of the Rule Order case, not the Surcharge Rate Order case. In addition, the 2013 amendment to the Act does not prohibit the PRC from including in the annual fund a prudent Fund balance, as evidenced by the fact that the PRC continues to have a prudent Fund balance requirement in its rules. *See* 17.11.10.19(C) NMAC. We do not interpret the "minimum" surcharge requirement in Section 63-9H-6(J) as authority to operate the Fund at a deficit.

{17}     It is also immaterial that the 3% Surcharge Rate is higher than the median or average of previous Surcharge Rates. Never in the history of setting Surcharge Rates had the PRC approved a Surcharge Rate that resulted in a projected deficit. The record reflects that surcharge rates of less than 3% were approved by the PRC when the beginning Fund balance was well over $2 million—the amount Solix

recommended as a prudent Fund balance. Once the projected Fund balance was approximately $2 million, as recommended by Solix, the PRC approved Surcharge Rates of 3.30%, and twice at 3.45%. The PRC consistently applied the 2005 version of Rule 17.11.10 through its 2013 Surcharge Rate Order. In fact, in its 2013 Surcharge Rate Order, the PRC commented that Rule 17.11.10 was being reexamined, but because the workshops addressing potential rule revisions were still ongoing, the PRC was not in a position to know the results of the workshops—that is, it would not know what rule changes or surcharge cap would result from its reexamination of the rules.

{18} Solix recommended a 3.62% Surcharge Rate for 2015, which would result in a projected surplus of $327,153. A 3.57% Surcharge Rate was projected to result in a nearly zero Fund balance. Solix projected that a 3% Surcharge Rate for 2015 would result in a $3,870,813 deficit at the end of 2015. Although the PRC Advisory Board concurred in Solix's recommendation, the PRC rejected it, despite Solix's projected deficit and the fact that the PRC had never before approved a Surcharge Rate that was projected to result in a Fund deficit. We are persuaded that the PRC Surcharge Rate Order is arbitrary, not supported by substantial evidence, and is a clear violation of its own rules, which require that the surcharge be large enough to allow for a prudent

Fund balance.  Accordingly, we reverse the PRC's Surcharge Rate Order.

**III.    THE RULE ORDER CASE (NMPRC Case No. 12-00380-UT; New Mexico Supreme Court Case No. S-1-SC-35036)**

{19}    The PRC issued the Rule Order on November 26, 2014, to be effective January 1, 2015.  Among provisions not relevant to this appeal, the Rule Order set a 3% surcharge cap and switched from a fixed calculation based on the ILEC's 2004 access minutes to a rolling approach that uses an ILEC's "intrastate access minutes for the calendar year that is two years prior to the year for which the calculation is made." 17.11.10.19(E) NMAC.  Each year the PRC issues an order determining the Fund size for the upcoming year.  *See* 17.11.10.19(A) NMAC.  Under the new rules that will be effective in 2017, an ILEC's payment will be based on its intrastate access minutes from 2015.  *See* 17.11.10.19(E) NMAC.

{20}    The N.M. Exchange Carrier Group argues on appeal that the PRC was arbitrary in its adoption of the aforementioned provisions for several reasons.  We first address the contention that the PRC prejudged the Rule Order by virtue of its adoption of the Surcharge Rate Order approving a 3% Surcharge Rate.  Specifically, the N.M. Exchange Carrier Group points to paragraph 7 of the Surcharge Rate Order wherein the PRC references the pending rulemaking and states that the changes " 'will reduce the payments from the Funds in 2015.' "  As additional evidence of the PRC's alleged

14

prejudgment, the N.M. Exchange Carrier Group refers to a statement by one commissioner that the Surcharge Rate Order was "just laying some ground work" for the Rule Order. Both the Surcharge Rate Order and the commissioner's statement were made before the Rule Order case was scheduled to be closed and before the public hearing regarding the proposed rule changes. If in fact the Surcharge Order, which was issued ten weeks prior to the Rule Order, preordained the results of the Rule Order, the Rule Order should be set aside. *See Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011) (setting aside an agency order when a draft order circulated before the comment period had expired). An agency that is considering rule changes must maintain an "open-minded attitude" until the rule is adopted so that interested parties can offer the benefit of their expertise to the agency through commentary. *Nat'l Tour Brokers Ass'n v. United States*, 591 F.2d 896, 902 (D.C. Cir. 1978).

{21}    It is difficult to understand what the PRC meant by its language in paragraph 7 of the Surcharge Rate Order. Without including the footnotes, the language provides in its entirety:

> Guided by the statutory directive that the surcharge "be held to a minimum,"[3] the [PRC] disapproves the recommended increase,[4] which would result in the highest surcharge rate in the history of the Fund.[5] Moreover, the recommendation of Solix is based on "business as usual,"

15

ignoring the 2013 statutory mandate to establish a cap on the surcharge and the pending rulemaking that will be completed this year.[6] These changes will reduce the payments from the Funds in 2015. Accordingly, the [PRC] finds that a projected Fund size of $21,186,339[7] and a 3.0% surcharge for calendar year 2015 should be approved at this time.

(The footnotes noted in this quotation have not been included in this opinion.) It is evident from the language of the Surcharge Rate Order that the PRC did not set a cap; it approved a 3% Surcharge Rate for calendar year 2015. In addition, the formula utilized by Solix and accepted by the PRC for deciding both the Fund size and the Surcharge Rate for the 2014 Surcharge Rate Order was the formula set forth in the 2005 version of Rule 17.11.10.19(E), not the formula that was proposed in the rulemaking case. However, the PRC's footnote 6, which addresses the pending rulemaking, states "[t]o the extent that Rule 17.11.10 (including 17.11.10.19(C) NMAC) requires the [PRC] to ignore these changes to the Fund, the [PRC] finds good cause for a variance." Footnote 6 strongly suggests that (1) the PRC was considering the pending rulemaking when it decided the Surcharge Rate case, and (2) the PRC did not follow the existing rules.

{22}     By contrast, a year earlier, when the PRC adopted the Surcharge Rate for 2014, at a time when the rulemaking was also pending, the PRC made it clear that the rulemaking proceeding was not a consideration in setting the 2014 rate. The PRC

16

stated in its Surcharge Rate Order that "[i]f revisions to Rule 17.11.10 require a change in the surcharge rate, the [Commission] can address the change when the revisions to the rule are implemented."

{23} Although the language we have quoted from the 2014 Surcharge Rate Order is troubling, the process followed by the PRC and the evidence that supports its adoption of the Rule Order persuade us that the PRC did not prejudge the rule amendments. Nonetheless, we agree with the N.M. Exchange Carrier Group that the amendments are not supported by substantial evidence.

{24} The rulemaking proceeding began on November 27, 2012, when the PRC issued a Notice of Proposed Rulemaking to (1) consider changes to residential and business affordability benchmarks, (2) update the data for determining a provider's revenue requirements to 2012 access minutes, (3) implement a 3% cap on the Surcharge Rate, and (4) establish exceptions to the surcharge cap. On January 23, 2013, the PRC entered an order vacating the rulemaking and procedural schedule under the Notice of Proposed Rulemaking and scheduled the first in a series of workshops for April 8, 2013. The order also asked participants to be prepared to discuss, among issues not relevant to this case, whether the PRC should (1) substitute 2012 intrastate access minutes for 2004 minutes in the formula used to determine an

eligible ILEC's revenue requirements under Rule 17.11.10.19, and (2) establish a cap on the Surcharge Rate. Written comments were due by March 25, 2013.

{25} The PRC received eleven sets of comments on March 25, 2013. Comcast favored a 3% surcharge cap because based on the thirteen states in which Comcast operates that have similar funds, ten states had surcharges under 3%, and eight states had surcharges below 2%. Verizon opined that the PRC should impose a cap of less than 3% and that the subsidy should be based on need. None of the remaining comments favored a cap. Just three days before the first workshop was scheduled, Governor Susana Martinez signed House Bill 58 into law resulting in the 2013 Amended Act, which in relevant part amended Section 63-9H-6(J) to require the PRC to establish a surcharge cap as part of the PRC's rulemaking. *See* 2013 N.M. Laws, ch. 194, § 4.

{26} On July 10, 2013, the PRC issued an order setting workshop schedules, requiring data from eligible ILECs, and soliciting comments regarding updating affordability benchmark rates, changing the formula for the determination of the annual fund, and implementing the 2013 amendments to the Act by considering a Surcharge Rate cap. In August 2013, the PRC received an additional fourteen sets of comments, with some supporting a 3% cap. Four workshops were conducted in

18

2013, with additional comments filed through January 24, 2014.

{27} The PRC issued a second Notice of Proposed Rulemaking on July 23, 2014, proposing to amend the surcharge rules to, among other things, implement a 3% cap on the Surcharge Rate and to begin a four-year transition from using 2004 access minutes to using 2012 access minutes to calculate the annual Surcharge Rate. The second Notice of Proposed Rulemaking also required those who wanted to comment on the proposed rule amendments to file written comments by August 22, 2014, with responses to the comments due no later than September 19, 2014. A public hearing was scheduled for October 1, 2014, and the record was scheduled to close on October 15, 2014.

{28} The N.M. Exchange Carrier Group contends that the permanent 3% surcharge cap is not supported by substantial evidence because the majority of those who commented regarding the second Notice of Proposed Rulemaking opposed the 3% cap, thus proving that the PRC arbitrarily committed itself to a 3% cap before the Rule Order case was complete. We are required to review the whole record, including the evidence both in favor of and contrary to the PRC's decision, when determining whether its decision is supported by substantial evidence, while looking at the evidence in the light most favorable to the PRC decision. *PNM Gas Servs. v.*

19

*N.M. Pub. Util. Comm'n* (*In re PNM Gas Servs.*), 2000-NMSC-012, ¶ 4, 129 N.M. 1, 1 P.3d 383. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rinker v. State Corp. Comm'n*, 1973-NMSC-021, ¶ 5, 84 N.M. 626, 506 P.2d 783. After reviewing the record in its entirety, we are persuaded that the PRC's decision to impose a 3% cap is not supported by substantial evidence.

{29} The PRC acknowledges that in response to the second Notice of Proposed Rulemaking, "[m]ost commenters oppose[d] the 3% cap," including the N.M. Exchange Carrier Group, Mescalero Apache Telecommunications, Inc., Navajo Communications, La Jicarita, Sacred Wind, the Attorney General of New Mexico, and the PRC staff. The PRC cited T-Mobile West, LLC as the only entity that supported a 3% cap. However, Comcast and Verizon had previously expressed their support for a 3% or lower cap. Notwithstanding the overwhelming opposition, the PRC adopted the 3% Surcharge Rate cap for a three-year period, believing that "the changes to the Access Reduction Support formula" would result in lower Fund payments, leaving sufficient "headroom for additional support" pursuant to 17.11.10.25 NMAC, if the need for additional support was established.

{30} Our review is not as simple as comparing the number of entities in favor of the

3% cap with those who either oppose the 3% cap or take no position on the cap. Our review requires us to look at the whole record and determine whether there is evidence to support the PRC's decision. *See In re PNM Gas Servs.*, 2000-NMSC-012, ¶ 4. In this case, the PRC states in its order that the change in Fund formula will result in lower Fund payments, which will leave a balance sufficient to address an eligible ILEC's proven needs. Two significant problems arise from this statement. First, the PRC admits that the "true sufficiency or insufficiency of the Access Reduction Support is not known." This is problematic because Section 63-9H-6(C) requires the Fund to provide "a specific, predictable and sufficient support mechanism" for eligible ILECs. In addition, payment to eligible ILECs is to be "in an amount equal to the reduction in revenues that occurs as a result of reduced intrastate switched access charges." Section 63-9H-6(K). Although a cap certainly offers specificity and predictability, the Fund must still be sufficient, and the PRC does not point to any evidence to establish that the new formula provides sufficient support. The record contains a report filed by Ken Smith, an economist for the Staff of the Telecommunications Bureau of the Utility Division, indicating that in 2012 ILECs were processing 125,719,653 total access minutes, which amounted to a reduction of almost 40% in traffic from 2004. *See Staff Comments on First Workshop*

*Issues and Data Tables* at 7 (August 5, 2013).  According to Smith, "[m]oving the base to 2012 minutes could reduce the payments from the fund by approximately 8-9 million." *Id.*  However, the accuracy of the data was questionable, and in any event, PRC staff recommended "a four-year phase-in of the 2012 minutes on a percentage basis." PRC staff also commented that projecting the demand side of the formula was made more complicated by House Bill 58, and it was therefore virtually impossible to establish the cap because of the uncertainty of demand.  PRC staff went on to recommend a 3.5% cap with an emergency escape clause because Fund revenues have been declining annually and Solix needed to provide realistic Fund balance projections.

{31}    The second problem with the PRC's reliance on lowering fund payments based on need is that the PRC admits that the support required by the Act does not require a showing of need to qualify for Access Reduction Support because Section 63-9H-6(K), which provides for Access Reduction Support, is independent from the need-based support in Section 63-9H-6(L).  Amended Rule 17.11.10.25(A) allows an eligible ILEC serving in a high-cost area to petition "for support from the fund when such payments are needed to ensure the widespread availability and affordability of residential local exchange service in the high-cost area of the state served by the

[eligible ILEC]." However, if the Fund is not "equal to the sum of each [eligible ILEC's] revenue requirements . . . plus projected administrative expenses and a prudent fund balance" as required by Rule 17.11.10.19(C), there will not be resources in the Fund from which to supplement the funds of an eligible ILEC that demonstrates need. For these reasons, we are not satisfied that the record in this case supports the PRC statement that "the changes to the Access Reduction Support formula" will result in lower Fund payments, leaving sufficient "headroom for additional support" pursuant to 17.11.10.25 NMAC. Perhaps the actual experience during calendar year 2015 will provide the evidence that supports the PRC Rule Order, but the evidence in the record before us does not do so.

{32} Although we conclude that the PRC has the authority to modify the funding formula as part of its rulemaking authority and it should establish a surcharge cap as required by the 2013 Act, we remand this matter to the PRC for further proceedings. The record must have substantial evidence to support a finding that the newly adopted funding formula is adequate to satisfy the requirements of Section 63-9H-6(C) and (K) and Rule 17.11.10.19(C), and that the surcharge cap has not been arbitrarily established.

**IV.    CONCLUSION**

23

{33}     We reverse the PRC's Surcharge Rate Order in NMPRC Case No. 14-00279-UT and also reverse the PRC's Rule Order in NMPRC Case No. 12-00380-UT.  We remand both matters to the PRC for further proceedings consistent with this opinion.

{34}     **IT IS SO ORDERED.**


_____
**EDWARD L. CHÁVEZ, Justice**


**WE CONCUR:**


_____
**BARBARA J. VIGIL, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**CHARLES W. DANIELS, Justice**


**JUDITH K. NAKAMURA, Justice, not participating**